# IN THE SUPREME COURT OF TENNESSEE
## AT JACKSON
April 10, 2014 Session Heard at McKenzie[1]

## STATE OF TENNESSEE v. JOHN T. FREELAND, JR.

**Automatic Appeal from the Court of Criminal Appeals**
**Circuit Court for Madison County**
**No. 10-409     Roy B. Morgan, Jr., Judge**

---

### No. W2011-01828-SC-DDT-DD - Filed September 17, 2014

---

Following a bench trial, the defendant was convicted of first degree premeditated murder, first degree felony murder, especially aggravated kidnapping, and tampering with evidence. The trial court imposed a sentence of death based on three aggravating circumstances: (1) the defendant had previously been convicted of one or more felonies involving the use of violence; (2) the murder was committed for the purpose of avoiding, interfering with, or preventing a lawful arrest or prosecution of the defendant; and (3) the murder was knowingly committed while the defendant had a substantial role in committing a robbery.  See Tenn. Code Ann. § 39-13-204(i)(2), (6), (7) (2010 & Supp. 2013).  The Court of Criminal Appeals affirmed the defendant's conviction and sentence.  On automatic appeal to this Court, we designated the following issues for oral argument: (1) whether the Court of Criminal Appeals committed error by affirming the trial court's determination that the defendant's confessions were freely and voluntarily made; and (2) whether under our mandatory review required by Tennessee Code Annotated section 39-13-206(c)(1), the sentence of death is disproportionate or invalid.[2]   Having carefully considered the issues raised by the defendant and the mandatory review provisions, we affirm the judgment of the Court of Criminal Appeals. We remand the case to the trial court, however, for the entry of a corrected judgment reflecting the trial court's merger of the defendant's convictions for first degree murder into a single conviction.

---

[1] Oral argument was heard in this case on April 10, 2014, at Bethel University in McKenzie, Tennessee, as part of this Court's S.C.A.L.E.S. (**S**upreme **C**ourt **A**dvancing **L**egal **E**ducation for **S**tudents) project.

[2] "Prior to the setting of oral argument, the Court shall review the record and briefs and consider all errors assigned.  The Court may enter an order designating those issues it wishes addressed at oral argument." Tenn. Sup. Ct. R. 12(2).

**Tenn. Code Ann. § 39-13-206(a)(1);**
**Judgment of the Court of Criminal Appeals Affirmed;**
**Case Remanded to the Trial Court for Entry of a Corrected Judgment**

JANICE M. HOLDER, J., delivered the opinion of the Court, in which GARY R. WADE, C.J., and CORNELIA A. CLARK, WILLIAM C. KOCH, JR., and SHARON G. LEE, JJ., joined.

A. Russell Larson and Angela Hopson, Jackson, Tennessee, for the appellant, John T. Freeland, Jr.

Robert E. Cooper, Jr., Attorney General and Reporter; William E. Young, Solicitor General; Leslie E. Price, Assistant Attorney General; Jerry Woodall, District Attorney General; and Jody S. Pickens, Assistant District Attorney General, for the appellee, the State of Tennessee.

## OPINION

### I. Facts and Procedural History

On June 22, 2009, a Chester County, Tennessee grand jury indicted John T. Freeland, Jr., on charges of first degree premeditated murder, first degree murder in the perpetration of especially aggravated kidnapping, especially aggravated kidnapping, conspiracy to commit aggravated robbery, and tampering with evidence.[3]  The State filed its notice of intent to seek the death penalty based on the aggravating circumstances set forth in Tennessee Code Annotated section 39-13-204(i)(2), (i)(6), (i)(7), and (i)(14).  The trial court granted Mr. Freeland's motion for a change of venue and moved the case to Madison County, Tennessee.

Mr. Freeland waived his right to a jury trial in the guilt and penalty phases.[4]  During a bench trial, the following facts were revealed.

---

[3] On April 14, 2010, the trial court granted the State's motion to amend the indictment to correct the date in count two from March 7, 2007, to March 7, 2009.  On December 7, 2010, the trial court entered an Order of Nolle Prosequi in count four of the indictment, which alleged conspiracy to commit aggravated robbery, and renumbered the remaining counts.

[4] Tennessee Code Annotated section 39-13-205(a) (2010) provides that "[i]n trials of first degree murder . . . [and] with the advice of the defendant's attorney and the consent of the court and district attorney general," the defendant may waive his right to have a jury determine both guilt and punishment.

On March 7, 2009, Harold Cain and his father, W.S. Cain, were walking on their property near Dry Creek Lane in Chester County when they heard a gunshot. Approximately fifteen minutes later, the Cains discovered a body lying near the road. Harold Cain described the person as a "lady laying face down . . . spread out . . . [and] clothed" with what looked like "a massive head wound." He called 9-1-1, and the dispatcher asked him to check the person's wrist for a pulse. Mr. Cain said that although he found no pulse, the body was not cold. Other than checking for a pulse, Mr. Cain did not touch or move the body, and the Cains secured the area at the dispatcher's request.

Bradley Crouse, a deputy with the Chester County Sheriff's Department, responded to the scene at 3:22 p.m. When Deputy Crouse arrived on the scene, he observed a white female in her mid-to-late fifties or sixties lying face down with blood pooling around her head. He had no contact with the body and collected no evidence. Deputy Crouse requested assistance from Henderson Police Officer Jason Rose and contacted the Tennessee Bureau of Investigation ("TBI").

Dr. Paul Schwartz, the Chester County medical examiner, arrived at the scene in the early afternoon to begin his assessment of the cause of death. He observed the body lying along a dirt road with an apparent gunshot wound to the head and saw at least one shell casing. Dr. Schwartz noted that the blood around her head was in the early stages of clotting, which indicated to him that the body had not been on the roadside very long. He ordered an autopsy to identify the victim and to determine the cause of her death.

At approximately 11:36 p.m. on March 7, 2009, Deputy Mark Taylor of the Madison County Sheriff's Department was dispatched to Potts Chapel Road in Madison County where a car was on fire in a field. Deputy Taylor checked the vehicle identification number and determined that the car, a Chevrolet Corsica, was registered to Carolyn Ward. The Chester County Sheriff's Department took possession of the car for further investigation.

Jason Crouse, an officer with the Chester County Sheriff's Department, assisted in the investigation at Dry Creek Lane. He initially was unable to determine the deceased woman's identity. When he learned of the burned vehicle in Madison County, however, Officer Crouse suspected that the vehicle and the body were connected. Officer Crouse obtained a driver's license photo and confirmed that the victim was Carolyn Ward.

Dr. Stacy Turner, a forensic pathologist employed by Forensic Medical in Nashville, Tennessee, performed Ms. Ward's autopsy. Dr. Turner observed gunshot wounds to Ms. Ward's head and right hand. Dr. Turner agreed that the position of the body at the time police responded to the call was consistent with Ms. Ward having been shot from behind.

Dr. Turner further opined that the bullet passed through Ms. Ward's skull from right to left and exited the left skull before entering her right hand and exiting through her right palm. Following her examination of Ms. Ward's body, Dr. Turner determined that the cause of death was multiple gunshot wounds and that the manner of death was homicide.

The investigation revealed that at approximately 1:33 p.m. on March 7, 2009, Ms. Ward called her son-in-law, Donnie Davis, to tell him that she was on her way to pick up the Davises' dog from their dog groomer and planned to leave the dog at their home. The dog was at the Davis residence when Mr. Davis arrived between 2:15 p.m. and 2:30 p.m.

Johnna Arnold and her sister met Ms. Ward for lunch on March 7, 2009, and then drove Ms. Ward to her home. Ms. Ward told Ms. Arnold that she planned to pick up her daughter's dog from the groomer by 2:00 p.m., return the dog to her daughter's home, and go to Fred's to purchase several two-liter bottles of Pepsi that were on sale. Ms. Arnold and her sister traveled to McNairy County, Tennessee, and returned to Henderson just before 2:00 p.m. As Ms. Arnold approached the intersection near Fred's, she saw Ms. Ward leaving the Fred's parking lot with a passenger. She described the passenger as a black person wearing a hoodie. Ms. Arnold initially gave no thought to the passenger because Ms. Ward frequently gave rides to others. Ms. Arnold became concerned, however, when she noticed Ms. Ward driving faster than her normal speed. Ms. Arnold saw another vehicle following Ms. Ward's vehicle. Both vehicles were traveling in the direction of Pinson, Tennessee.

Chester County Sheriff Blair Weaver, who was Chief Deputy on March 7, 2009, was involved in the investigation of Ms. Ward's murder. He obtained a video surveillance recording from the Piggly Wiggly grocery store ("Piggly Wiggly") located adjacent to Fred's. Sheriff Weaver viewed the video and identified a green Chevrolet Corsica that he believed to be Ms. Ward's car leaving the parking lot at approximately 1:59 p.m. Sheriff Weaver noticed that another car was following "pretty close" to Ms. Ward's car. The recording showed that the second car, a blue Buick Roadmaster, had pulled into the Fred's parking lot at 1:53 p.m. Sheriff Weaver could not see the occupants of the Roadmaster and could not obtain a license plate number. The vehicles were traveling toward Pinson, where Ms. Ward's body was eventually found and where the Corsica was burned.

Chief Deputy Mark Griffin of the Chester County Sheriff's Department participated in the investigation. He identified a number of photographs depicting the crime scene. Deputy Griffin collected items of evidence including a .380-caliber shell casing, a bullet found near Ms. Ward's hand, and a water bottle. He provided these items to Agent Mark Lewis of the TBI. He recalled seeing tire marks on Dry Creek Lane but did not order casting of the tire prints. Deputy Griffin recalled that the burning car in Madison County helped them identify Ms. Ward from her driver's license photo. He also watched the surveillance recording from Piggly Wiggly.

4

On Monday, March 9, 2009, Deputy Griffin sought assistance from Lieutenant Patrick Willis, Sergeant Phillip Kemper, and Investigator Julian Wiser, all of the Jackson, Tennessee, Police Department's Gang Enforcement Team, concerning the Buick Roadmaster shown in the video recording. Sergeant Kemper and Lieutenant Willis briefed Investigators Samuel Gilley and Warren Olden, members of the Jackson Street Crimes Unit, and told them to be on the lookout for a blue Buick Roadmaster.

On March 10, 2009, Investigator Gilley began looking for a heavy-set, black male and a vehicle matching the description of the vehicle shown in the Piggly Wiggly surveillance recording. Investigator Gilley and Officer Olden saw a blue Buick Roadmaster parked at a shop on Royal Street across from the Popeye's Chicken restaurant. They eventually observed a heavy-set, black male with dreadlocks getting into the car. The two officers followed the Roadmaster but lost sight of the vehicle. The officers searched the State's database for the license plate number on the Roadmaster and determined that the vehicle was registered to John T. Freeland and that Mr. Freeland's license was "suspended with priors." The driver's license photo on record for Mr. Freeland matched the person whom they saw driving the Roadmaster.

Soon thereafter, Investigator Gilley and Officer Olden saw the Roadmaster leaving the Park Place Apartments in Jackson and initiated a traffic stop. Mr. Freeland was driving the vehicle at the time of the stop, and his passenger was identified as Marcus Thompson. Mr. Freeland produced a Tennessee driver's license. After searching the State's database, Investigator Gilley confirmed that Mr. Freeland's license was suspended. Investigator Gilley placed Mr. Freeland under arrest, and Officer Olden began searching the vehicle. The search revealed a gun and a copy of the Jackson Sun newspaper that contained a story about Ms. Ward's shooting in Chester County. The search also revealed a bandana, a ski mask, a live .380-caliber handgun round, and a pair of sports gloves. In the trunk of the car, the officers discovered a ski mask and a small amount of marijuana. Investigator Gilley placed Mr. Freeland under arrest and handcuffed him but did not give him Miranda warnings.

Officers Gilley and Olden secured the vehicle and notified Sergeant Kemper that a vehicle matching the Roadmaster in the Piggly Wiggly video recording had been stopped. Sergeant Kemper arrived after the traffic stop and immediately recognized that Mr. Thompson was wearing "gang type clothing," specifically, a bandana hanging from his pocket. Sergeant Kemper knew from his training and experience that gang members commonly carry bandanas and refer to them as "flags" when folded and worn in the back pocket. The vehicle also contained a camouflage face mask, a pair of black gloves, a blue bandana, and a black bandana. Sergeant Kemper photographed the items in the vehicle, and the vehicle was sealed and transported to the TBI laboratory in Nashville for processing.

5

The Jackson Police Department subsequently informed Deputy Griffin that they had located the blue Buick Roadmaster and had two people in custody. Deputy Griffin viewed the vehicle and described it as "very similar" to the car in the video recording. He learned that the driver of the vehicle was John T. Freeland and that Lieutenant Willis and Sergeant Kemper had spoken to Mr. Freeland. Mr. Freeland told the officers that he had taken two license plates from the victim's car and had thrown them into the area surrounding the burned car. Deputy Griffin traveled to the scene and located two license plates, which he gave to Agent Lewis. Johnny Garner, the Chester County Clerk, later identified the plates as belonging to Ms. Ward.

On March 10, 11, and 16, 2009, Mr. Freeland submitted to three separate interviews with Sergeant Kemper and Lieutenant Willis concerning his involvement in Ms. Ward's death. Before each interview, Sergeant Kemper read to Mr. Freeland the Jackson Police Department's "Rights Waiver Form," which explains a suspect's constitutional rights pertaining to interviews, including his rights under Miranda v. Arizona, 384 U.S. 436 (1966). Mr. Freeland signed the Rights Waiver Form before each interview began. Sergeant Kemper further testified that he made written notes during each interview and reduced those notes to formal, written statements that Mr. Freeland reviewed, approved, initialed, and signed.

In his March 10, 2009 statement, Mr. Freeland explained that on March 7, 2009, he and Mr. Thompson picked up Mr. Thompson's girlfriend, Tashondra Mosley, and were "just chilling and riding around" in Henderson, eventually pulling into the Fred's parking lot. Moments later, Mr. Thompson exited Mr. Freeland's car and jumped into the passenger seat of a Chevrolet Corsica that was being driven by a white lady. The lady and Mr. Thompson drove away in the Corsica, headed toward Jackson. Mr. Freeland and Ms. Mosley followed behind them, and when the lady suffered an apparent seizure, the two vehicles stopped on the shoulder of the road. Mr. Thompson told Mr. Freeland that "he was going to drop [the lady] off." According to Mr. Freeland, he then met Mr. Thompson, who was driving the Corsica. Mr. Thompson got into Mr. Freeland's car with Ms. Mosley and instructed Mr. Freeland to drive the Corsica to an elementary school.

Later, Mr. Thompson and Ms. Mosley joined Mr. Freeland in the Corsica. After Mr. Freeland purchased gloves from Dick's Sporting Goods, the trio traveled to Memphis, Tennessee, to commit robberies. When they returned to Jackson, Mr. Thompson drove the Corsica to a rural area, and Mr. Freeland and Ms. Mosley followed in Mr. Freeland's vehicle. They removed license plates from the Corsica, which Mr. Freeland threw "like frisbees." Mr. Thompson poured gasoline on the front of the Corsica's interior, lit it, and the three of them drove away. Mr. Freeland said he did not know that anything was going to happen when they drove to Henderson.

6

On March 11, 2009, Mr. Freeland was interviewed about other possible crimes that he had referenced during the March 10 interview. During his second interview, Mr. Freeland told Sergeant Kemper that he wanted to clarify portions of his March 10 statement because he was tired from the night before and "had a lot on [his] mind." Consistent with his previous statement, Mr. Freeland stated that he, Mr. Thompson, and Ms. Mosley traveled to Henderson in Mr. Freeland's vehicle to "get a car to go to Memphis in." As they sat in the Fred's parking lot, Mr. Thompson pointed to an older, white lady who had exited Fred's and was putting her bags into the trunk of a Corsica. At Mr. Thompson's instruction, Mr. Freeland got into the passenger side of the vehicle and ordered the lady to drive. Mr. Freeland had a gun lying on his lap. Mr. Thompson and Ms. Mosley followed behind in Mr. Freeland's vehicle. The vehicles pulled off the road, however, when the lady had a seizure.

Mr. Thompson moved to the backseat, the lady moved to the passenger's seat, and Mr. Freeland drove the vehicle. Mr. Freeland stopped the vehicle on a dirt road, and Mr. Thompson pulled the lady out of the car onto her knees. Mr. Freeland left them and drove back down the road, turning the car around three times to confirm that they were alone. He heard a gunshot and saw the lady lying face down with Mr. Thompson standing approximately two feet away looking at the gun. Mr. Thompson got back into the vehicle and sat silently for a minute before uttering, "Man, it was hard to pull the trigger." The two men met Ms. Mosley at the elementary school. After purchasing marijuana, they drove to Memphis. When they returned to Jackson, Mr. Thompson placed bottles of Pepsi and clear floor mats in Mr. Freeland's trunk. Mr. Freeland confirmed his March 10 statement about burning the lady's car, and he told the officers that he believed the bottles of Pepsi were in Ms. Mosley's apartment.

On March 16, 2009, Investigator Willis advised Sergeant Kemper that Mr. Freeland wanted to speak with them again to "clear up some confusion" created by his prior two statements. Mr. Freeland explained that while he was checking the road, he only turned the car around once instead of three times as previously stated. He told the officers that he heard the gunshot as he was turning the car around and saw Mr. Thompson standing over the lady's body with a gun. When Mr. Thompson got into the car, he told Mr. Freeland that he knew why the lady was in a hurry to get out of the car. Mr. Thompson said the lady had a cell phone in her pocket. Mr. Thompson thought the lady would run, but she did not. Mr. Freeland said the two liters of Pepsi at his apartment were probably from the lady's trunk. Mr. Freeland said it was unlike him to "be involved in these crimes" but that he "just got caught up needing money." He said he met Mr. Thompson when he was twenty-six years old, was in bad financial shape, and did not want to move back into his parents' home where he would be subject to their rules.

On March 17, 2009, Lieutenant Willis asked Mr. Freeland if he would submit to a polygraph examination. Mr. Freeland agreed, and on March 17, 2009, he was transported

7

to TBI headquarters for the examination. TBI Special Agent Valerie Trout met with Mr. Freeland and explained that she would be conducting the polygraph examination.[5] Special Agent Trout first discussed with Mr. Freeland a TBI Consent to Polygraph form, which informed Mr. Freeland that taking a polygraph examination was voluntary and established the parameters of the examination. After Special Agent Trout read the form aloud to Mr. Freeland, Mr. Freeland signed and dated it. Lieutenant Willis witnessed his signature, and Special Agent Trout read aloud to Mr. Freeland a "TBI Warning of Constitutional Rights Form." Mr. Freeland read the waiver portion aloud and after indicating that he understood his rights, signed the waiver, which was witnessed by Special Agent Trout and Lieutenant Willis.

Lieutenant Willis went to an adjoining observation room with a two-way mirror where he could observe and hear the interview. Shortly after the interview began, however, Mr. Freeland dropped his head and told Special Agent Trout that he shot Ms. Ward. Based on Mr. Freeland's admission, Special Agent Trout stopped preparing Mr. Freeland for the polygraph examination and asked Lieutenant Willis to return to the interview room to witness the taking of Mr. Freeland's written statement. Special Agent Trout explained to Mr. Freeland that he could write the statement, she could write the statement, or she could type the statement. Mr. Freeland indicated that he wanted the statement to be typed. The statement began at 12:03 p.m. After the statement was typed, Special Agent Trout read the statement with Mr. Freeland and allowed him to make and initial any changes. Mr. Freeland signed the statement in the presence of Special Agent Trout and Lieutenant Willis. Special Agent Trout read the statement into the record.

Mr. Freeland stated that on Saturday morning, March 7, 2009, he, Marcus Thompson, and Ms. Mosley's son, Hog, took Ms. Mosley to the location of her community service. While Ms. Mosley was performing her community service, Mr. Thompson talked with Mr. Freeland about the need for a car that could not be traced back to them to be used in robberies. They discussed locations from which they could steal a car and planned to target an older person, steal the older person's car, and leave that person in another location outside of town.

---

[5] In a pretrial ruling, the trial court excluded any reference to a polygraph examination or to Mr. Freeland's willingness to take a polygraph test. As discussed below, Mr. Freeland's counsel raised for the first time during the trial the claim that Mr. Freeland's March 17, 2009 statement should be suppressed because he was induced by the false promise of a polygraph test. The trial court allowed counsel to pursue this line of testimony for the limited purpose of determining whether Mr. Freeland was falsely induced into giving his statement to Special Agent Trout. The trial court explained that it had the ability in a bench trial to disregard inadmissible or irrelevant evidence without affecting the outcome of the trial.

8

At approximately 12:00 noon, they met Ms. Mosley at her community service location, took Hog to the home of Ms. Mosley's mother, and returned to Ms. Mosley's home to change clothes. When they left for Henderson, Ms. Mosley was wearing a black durag, a black shirt, and blue gloves. Mr. Thompson was wearing the black pants and black pullover later found in the trunk and black suede shoes with brown soles. Mr. Freeland was wearing black Air Jordan shoes, black Dickies pants, a black sleeveless t-shirt, and the black hoodie found in the trunk. Mr. Freeland also brought an orange t-shirt.

Ms. Mosley drove Mr. Freeland's blue Buick Roadmaster to Henderson. Mr. Freeland occupied the backseat, and Mr. Thompson rode in the front passenger seat. They intended to steal a car at the car wash in Henderson, but Ms. Mosley missed the turn. Instead, they ended up in the Fred's parking lot. First, they followed an elderly couple driving a white Lincoln automobile to their home. Ms. Mosley was unable to pull in behind them, and when Ms. Mosley turned the car around, the elderly couple were removing groceries from their car. When Mr. Freeland and his accomplices noticed an older woman sitting outside a neighboring house, they abandoned their plan.

The three drove back to the Fred's parking lot and followed a woman who was driving a newer-model BMW. Ms. Mosley followed the BMW as it parked behind a restaurant. Ms. Mosley asked the woman about the weather, and then Mr. Freeland told Ms. Mosley to drive away.

When they went back to Fred's, Mr. Thompson noticed a car that was parked in a handicapped space in front of Fred's and indicated to the others that "[r]ight there is the car." Mr. Thompson handed Mr. Freeland the .380-caliber handgun that Mr. Freeland had obtained from a friend. Mr. Freeland jogged across the parking lot, got into the passenger seat of the car, and with the gun on his leg, told the woman to drive.

The woman asked Mr. Freeland where they were going, but Mr. Freeland told her not to worry about it. Ms. Mosley drove behind them in Mr. Freeland's car. When Mr. Freeland asked the woman why she was driving so slowly, she told him that she was epileptic and should not be driving. The woman had a seizure while driving, but Mr. Freeland was able to put his foot on the brake. Mr. Freeland said that he knew she was faking because he saw her reach for the door handle when the car stopped. Ms. Mosley and Mr. Thompson stopped the Buick Roadmaster in front of the woman's vehicle. Mr. Thompson walked up to the driver's side and took the gun from Mr. Freeland. Mr. Thompson told the woman to cooperate or he would kill her and handed the gun back to Mr. Freeland.

Ms. Mosley continued driving the Roadmaster, and the woman followed Ms. Mosley and Mr. Thompson for several turns until Ms. Mosley stopped on a straight portion of the road. Mr. Thompson got into the car with the woman and Mr. Freeland. The woman told

9

them that "[t]hey would not find all the money." Mr. Thompson rummaged through the car and found between sixty dollars and eighty dollars in her billfold. Mr. Thompson gave Ms. Mosley twenty dollars and told her to go to the gas station and then to go home. Mr. Freeland, Mr. Thompson, and the woman proceeded down a dirt road. Mr. Thompson instructed the woman to get out of the vehicle, and when the woman moved too slowly for Mr. Thompson, he yanked her to her knees. Mr. Thompson then told Mr. Freeland to go down the road and make sure that no one was coming.

Mr. Freeland drove down the road, turned around, and came back. He saw Mr. Thompson standing over the woman with the gun that Mr. Freeland had given him. Mr. Thompson told Mr. Freeland that he could not pull the trigger and handed the gun to Mr. Freeland. Mr. Freeland disengaged both safeties and began to return the gun to Mr. Thompson when he saw a "look" in Mr. Thompson's eyes that caused him to fear that Mr. Thompson might shoot him. The woman was lying on the ground next to the driver's side of the car. Mr. Freeland stuck his arm out of the driver's side window and shot the woman in the head. Mr. Thompson asked Mr. Freeland why he shot the woman and questioned whether Mr. Freeland was trying to "upstage him." Mr. Thompson appeared to be angry that he was not the shooter.

When questioned by Mr. Thompson as they drove away, Mr. Freeland confirmed that the woman was dead. They saw Mr. Freeland's car and realized that Ms. Mosley had not returned home. Mr. Thompson scolded Ms. Mosley, got into the Roadmaster with her, and told Mr. Freeland to meet them behind Lincoln Elementary School in Jackson. Because others were in the area of the school, however, Mr. Freeland drove the stolen car into the driveway of what appeared to be a vacant house. The three of them exited their vehicles and examined the contents of the stolen car's trunk but decided to leave when they saw a woman on the front porch of the house. They drove to the apartment shared by Ms. Mosley and Mr. Thompson, where they replaced the stolen car's license plate with another license plate they found in the trunk of the stolen car. Mr. Thompson gave Mr. Freeland twenty dollars to purchase new gloves at Dick's Sporting Goods, and they placed red tape over the light illuminating the license plate of the stolen car so that it would not be obvious that the tag had expired.

They purchased marijuana, and Ms. Mosley drove the two men to Memphis in the stolen car to look for places to rob. On their way to Memphis, they stopped to purchase gasoline, and Mr. Thompson asked Mr. Freeland to fill a Jungle Juice container with gasoline. Later that day, they left Memphis after looking, without success, for places to rob. They returned to the Mosley/Thompson apartment where they retrieved Mr. Freeland's car. Mr. Thompson removed from the stolen car some folding chairs, the two-liter bottles of Pepsi, and the car's floormats. He placed the floormats in the trunk of the Roadmaster.

10

Mr. Thompson drove away in the Corsica, and Mr. Freeland and Ms. Mosley followed behind in the Roadmaster. Mr. Freeland originally thought that they were driving the Corsica to the lake to dispose of it, but Mr. Thompson pulled the Corsica off the road and poured gasoline into its interior. Mr. Freeland stood at the trunk of the Corsica and threw the license plate "like a frisbee" toward the woods. Mr. Thompson dropped burning paper into the trunk and into the interior of the vehicle. Mr. Freeland's gloves were in the backseat of the vehicle.

After setting fire to the Corsica, Mr. Freeland drove Mr. Thompson and Ms. Mosley back to the Mosley/Thompson apartment. Mr. Thompson left one of the bottles of Pepsi in Mr. Freeland's car, and Mr. Freeland put the other items in Mr. Thompson's apartment. When Mr. Thompson returned from the apartment, he told Mr. Freeland that Mr. Freeland had obtained the status of "OBG, Original Baby Gangster," which would make him second in command. Mr. Thompson told Mr. Freeland that if they were incarcerated, Mr. Freeland would be responsible for the murder and would become an "OG, Original Gangster."

Mr. Thompson showed Mr. Freeland the victim's cell phone. Mr. Freeland found a license plate under the seat in his car. Mr. Freeland took the woman's phone and the license plate and threw them on his couch.

After providing this information to Special Agent Trout, Mr. Freeland initialed and signed the statement.

Based on the information contained in Mr. Freeland's statements, police searched the residence shared by Mr. Thompson and Ms. Mosley. Lieutenant Willis also obtained the consent of Mr. Freeland's mother to search Mr. Freeland's bedroom at her residence. There, the officers retrieved black Dickies pants, black Air Jordan shoes, and a bandana. Jackson Police Lieutenant Julian Wiser obtained consent to search the apartment of one of Mr. Freeland's girlfriends, Lakeshia Carroll, with whom he shared the apartment. Lieutenant Wiser collected, among other things, mail addressed to Mr. Freeland at the apartment address, a vehicle title for the Roadmaster, black Nike tennis shoes, an orange t-shirt, a black t-shirt, brown pants, .22-caliber bullets, and a box of .380-caliber Remington ammunition. Lieutenant Wiser also collected a cell phone and a handicapped hang tag, both of which were later identified as belonging to the victim. Investigator Charles Mathis of the Jackson Police Department assisted in the search of the apartment shared by Mr. Thompson and Ms. Mosley. Investigator Mathis collected black clothing and several two-liter bottles of Pepsi that he suspected were taken from the victim's car.

TBI Special Agent Mark Lewis also participated in the investigation. He obtained a surveillance video recording from the gas station where the three stopped after Ms. Ward was killed. The video shows Mr. Freeland wearing an orange t-shirt and dancing while Mr. Thompson purchased drinks. Special Agent Lewis also obtained DNA samples from Mr.

11

Freeland and Ms. Mosley.[6]  Special Agent Lewis examined Mr. Freeland's cell phone and reviewed photographs and text messages between Mr. Freeland and another girlfriend, Chinita Perry.  The State introduced as evidence a series of text messages exchanged between Mr. Freeland and Ms. Perry near the time of Ms. Ward's death.  In addition, the State introduced photographs retrieved from the cell phone showing Mr. Freeland in an orange t-shirt and holding a gun.

TBI Special Agent Robert Daniel Royse, an expert in firearms and ballistics, examined the .380-caliber handgun found in Mr. Freeland's vehicle.  The gun had three safety features, two of which must be manually disengaged before firing.  The gun was fully functional and had no operational issues.  Special Agent Royse examined the .380-caliber cartridge found in the ashtray of Mr. Freeland's vehicle, the shell casing found at the scene, and the bullet found at the scene.  He determined that the markings were consistent with having been fired from the gun recovered from Mr. Freeland's vehicle.  Special Agent Royse also determined that the box of ammunition recovered from Mr. Freeland's apartment matched the cartridge, shell casing, and bullet found in Mr. Freeland's vehicle.  Special Agent Royse also concluded that the ammunition matched the bullet and shell casing that were recovered at the crime scene and matched the three rounds remaining in the gun's magazine.

TBI Special Agent James Russell Davis analyzed swabs collected from Mr. Freeland's vehicle and from items found in his vehicle.  He determined that the black Nike batting gloves found in his vehicle contained gunshot residue.  His tests also revealed the presence of gunshot residue on the driver's side door, passenger door, steering wheel, gearshift, and console.  Special Agent Davis found no gunshot residue on any of Mr. Freeland's clothing but explained that if the clothing had been washed or if Mr. Freeland shot the victim while seated in the vehicle, the vehicle door would have prevented gunshot residue from scattering to his clothing.

Hunter Greene, a TBI latent fingerprint examiner, examined items collected from Mr. Freeland's vehicle and residence.  Mr. Greene found no identifiable prints on the handgun, floor mats, cartridges, license tags, cell phone, or shell casings.  He found, however, an identifiable print on the handicapped hang tag that was recovered from Mr. Freeland's apartment.  Mr. Greene explained that the absence of prints could be caused by a person wearing gloves.

Special Agent Jennifer Shipman, a TBI serologist, examined a pair of green and white gloves and a pair of black Nike gloves recovered from the blue Buick Roadmaster for the

---

[6] Mr. Thompson's DNA sample was already in the DNA database.

presence of DNA. Agent Shipman excluded Ms. Ward as a contributor of the DNA found on either pair of gloves. She determined that Mr. Freeland was not a contributor of the DNA found on the green and white gloves but that he was "the major contributor" of DNA on the black Nike gloves.

Mr. Freeland testified on his own behalf against the advice of counsel and following the trial court's discussion with him concerning his decision to testify. Mr. Freeland said he was guilty only of tampering with evidence through his participation in burning Ms. Ward's vehicle. As to the March 10, 2009 statement, Mr. Freeland said he did not execute a waiver of his Miranda rights prior to giving the statement. According to Mr. Freeland, the officers told him that they needed his signature on a waiver form approximately thirty or forty minutes into the interrogation. Mr. Freeland acknowledged, however, that he understood what he was signing and that he freely had a discussion with the officers.

When asked to identify the truthful portions of the March 10, 2009 statement, Mr. Freeland said that the statement was false until the point at which he described Mr. Thompson's and Ms. Mosley's return to Jackson from Memphis. He testified that he had no knowledge of what occurred in Henderson and learned the details from talking with Mr. Thompson and Ms. Mosley. Mr. Freeland explained that he was not under oath when he gave the statement and that the officers threatened him, telling him that they had his car on a video recording. Mr. Freeland asserted, however, that his trial testimony was truthful because he was under oath.

Mr. Freeland recalled giving a statement on March 11, 2009, and signing a waiver form within five or ten minutes of entering the interrogation room. He testified that he had been sleeping "very little" at the time and had given false information to the officers but was not under oath. He knew about the bottles of Pepsi because he saw Mr. Thompson remove items from Mr. Freeland's car after they burned the stolen car.

On March 16, 2009, Mr. Freeland gave his third statement after he told his mother that he would like to speak with the investigators because he wanted to tell the officers that he was not in Chester County and had nothing to do with Ms. Ward's murder. Mr. Freeland claimed that when he tried to tell the officers the truth, they told him that they had evidence. Mr. Freeland acknowledged, however, that he signed the waiver form.

Mr. Freeland testified that he agreed to take a polygraph examination and was transported to the TBI office. When he arrived, Mr. Freeland signed two waivers—waiver of rights and a consent to take the polygraph examination. He testified that his sole purpose in going to the TBI office was to submit to a polygraph examination. When asked about the resulting statement, Mr. Freeland stated that he learned the details of the crime scene from conversations with Mr. Thompson and Ms. Mosley and from the various officers'

13

interrogations. He explained that he lied to Special Agent Trout about shooting the victim because it was the only way that he could take a polygraph examination.

Mr. Freeland admitted that he went to the gas station shortly after Ms. Ward's death but claimed that he was unaware that she had been killed. He acknowledged that his black gloves may have contained gunshot residue. He claimed, however, that the presence of the gunshot residue resulted from a secondary transfer and not from firing the weapon.

Mr. Freeland testified that he lied to investigators because he felt threatened by Mr. Thompson. He stated that he never gave them details because he did not know the details. He claimed that the investigators inserted the details and that the only changes he made to his statement on March 17 were those that the officers permitted him to make. Mr. Freeland stated that he would have admitted to anything just to be allowed to take the polygraph test. Finally, Mr. Freeland denied speaking with anyone else about the crime and denied knowing anyone named "Hywon Reed."

In rebuttal, the State called Hywon Reed, who shared a jail cell with Mr. Freeland in Jackson in December 2010. According to Mr. Reed, Mr. Freeland gave him details about carjacking someone in Chester County. Mr. Freeland described how he, his friend, and his friend's girlfriend targeted a victim in a parking lot. Mr. Freeland told him that he had a gun and got into the car with the victim. Mr. Freeland's friend and girlfriend drove behind them in his vehicle. Mr. Freeland told Mr. Reed that the victim "pissed him off" because she would not give him any money or her ATM code. Mr. Reed testified that Mr. Freeland told him that the victim said she was going to report them to the police and could identify them. Mr. Freeland admitted that at that point he knew he would have to kill her. Mr. Reed sent a letter to the district attorney general detailing his conversation with Mr. Freeland.

At the close of the proof, the trial court found Mr. Freeland guilty of all charges. As noted by the Court of Criminal Appeals, No. W2011-01828-CCA-R3-DD, 2013 WL 2423934, at *19 (Tenn. Crim. App. June 3, 2013), the trial court erred by failing to merge count two into count one for a single conviction for first degree murder. See State v. Cribbs, 967 S.W.2d 773, 778 (Tenn. 1998).

By agreement of the parties, the penalty phase was continued to May 23, 2011.

Penalty Phase

14

On May 23, 2011, the trial court conducted the penalty phase of Mr. Freeland's trial.[7] In its notice of intent to seek the death penalty, the State relied on four statutory aggravating circumstances: (1) the defendant was previously convicted of one or more felonies, other than the present charge, the statutory elements of which involve the use of violence to the person; (2) the murder was committed for the purpose of avoiding, interfering with, or preventing a lawful arrest or prosecution of the defendant or another; (3) the murder was knowingly committed, solicited, directed, or aided by the defendant, while the defendant had a substantial role in committing or attempting to commit, or was fleeing after having a substantial role in committing or attempting to commit aggravated robbery; and (4) the victim of the murder was particularly vulnerable due to a significant handicap or significant disability, whether mental or physical, and at the time of the murder the defendant knew or reasonably should have known of such handicap or disability. See Tenn. Code Ann. § 39-13-204(i)(2), (6), (7), (14).

The State introduced evidence of Mr. Freeland's January 4, 2010 conviction for the aggravated robbery of a Dollar General Store in Jackson committed on March 5, 2009. Specifically, the State introduced, without objection, a transcript of Mr. Freeland's guilty plea and a certified copy of his conviction.

Lieutenant Willis testified that Mr. Freeland gave a statement concerning his participation in the robbery in which Mr. Freeland explained that he and Mr. Thompson needed money and decided to rob the Dollar General Store. They wore all-black clothing with bandanas over their faces and waited nearby for approximately thirty minutes. Mr. Thompson said, "Let's go," and the two men approached the store. Mr. Freeland was the first to go inside the store and carried the only gun. He instructed the clerk to open the register and give them the money. When the clerk explained that the register would not open without a purchase, Mr. Freeland grabbed a pack of batteries, which the clerk rang up on the register. The register drawer opened, and Mr. Thompson grabbed the cash. The two men walked back to the car and divided approximately eighty dollars.

The State next presented the testimony of Sergeant Kemper, who interviewed Mr. Freeland on a number of occasions. Sergeant Kemper reviewed his notes from the March 11, 2009 interview and recalled that Lieutenant Willis asked Mr. Freeland in reference to Ms.

---

[7] The sentencing hearing combined the penalty phase of the death penalty trial with a sentencing hearing for the especially aggravated kidnapping and tampering with evidence convictions. The trial court therefore heard evidence relating to matters not relevant to its determination of the appropriate penalty for Mr. Freeland's convictions for first degree murder. While this evidence would clearly have been inadmissible in the penalty phase if a jury had been empaneled, the trial court's ruling clearly states its separate consideration of the evidence pertaining to the death penalty and the remaining convictions. In our review, we are primarily interested in the evidence relating to the three statutory aggravating circumstances, the statutory and non-statutory mitigating circumstances, and the trial court's imposition of the death penalty.

15

Ward, "Why did she have to die?" According to Sergeant Kemper's notes, Mr. Freeland responded that their faces were not covered.

The State also called Rhonda Hunt, a nurse practitioner at Trinity Medical Clinic in Selmer, Tennessee. Ms. Hunt previously worked at Frix-Jennings Clinic in Henderson, where she became acquainted with Ms. Ward and provided care to her for arthritis, morbid obesity, severe edema, cellulitis of her lower extremities, weakness, blood clots in her legs, and seizures. Ms. Hunt testified that Ms. Ward was approximately five feet tall and weighed approximately 280 pounds. She stated that Ms. Ward's weight affected her gait and that her waddling gait was immediately apparent. Due to Ms. Ward's mobility issues, Ms. Hunt assisted Ms. Ward in obtaining a disability tag. She testified that Ms. Ward occasionally had petit mal seizures, which caused her to lose consciousness for up to sixty seconds. Ms. Hunt added that these seizures can be attributed to several factors, including stress.

The State presented victim impact evidence through witnesses Jimmy Dyer and Mary Davis. Jimmy Dyer, the former principal at West Chester Elementary School, knew Ms. Ward through her years of volunteer work at the school. Ms. Ward provided individual tutoring to children, ran errands for the teachers, and did almost anything that the teachers asked her to do. At some point, she had worked with all three hundred students, and the students referred to her as "Granny." Mr. Dyer stated that Ms. Ward had a great influence on everyone in the building and that she often purchased necessities for low income children.

Mary Davis, Ms. Ward's daughter, stated that her mother was on a fixed income but was a very giving person. Ms. Ward made baby quilts and blankets for almost every baby born in Chester County whether or not she knew their families. Ms. Davis agreed that her mother waddled and had health issues. She stated that her mother had a handicap hang tag on the rearview mirror of her vehicle. Ms. Davis heard about the murder on the police scanner and later learned from her boss that the murder victim was her mother. Ms. Davis said she thinks of her mother every day.

Mr. Freeland presented the testimony of his mother, his stepfather, and his younger brother. Mr. Freeland's mother, Paula Renee Johnson, described Mr. Freeland as a normal son who liked to play baseball and soccer. She explained that she married Johnny Johnson when Mr. Freeland was two years old and that Mr. Johnson raised Mr. Freeland. Mrs. Johnson identified photographs of Mr. Freeland and his report cards through the years. She explained that Mr. Freeland and his younger brother are very close. The family went to church regularly. They urged Mr. Freeland to move out of the family home to help him succeed in life and become a man. She explained that Mr. Freeland has a good relationship with his daughter and son.

16

Johnny Johnson testified that his stepson is a "good son" but is easily persuaded. He described Mr. Freeland as an outgoing and very respectful person and testified that he had never been a violent person. Mr. Johnson identified various certificates that Mr. Freeland had received through Job Corps. He stated that Mr. Freeland loves his two children and asks about them frequently. Mr. Freeland originally admitted to him that he killed Ms. Ward, but after being incarcerated for some time, he denied killing her. Mr. Johnson testified that he believes Mr. Freeland.

Howard Jarrell Johnson, Mr. Freeland's younger brother, testified that he and his brother have a supportive relationship and that Mr. Freeland loves his children and tried to provide for them. Mr. Johnson stated that Mr. Freeland felt sorry about the current situation, and he asked the trial court to show leniency and forgiveness.

Mr. Freeland also testified during the penalty phase of his trial. He stated that he was sorry for whatever role he played in Ms. Ward's death and for any pain that he had caused by allowing Mr. Thompson and Ms. Mosley to use his vehicle. He maintained his innocence in Ms. Ward's kidnapping and murder and stated that he lied to the police when he told them that he was involved. Mr. Freeland claimed that he told the investigators that he did not kill Ms. Ward and that he did not know why she had to die. He added that Sergeant Kemper was lying if he said otherwise. Mr. Freeland admitted that he pleaded guilty to the aggravated robbery of a Dollar General Store in Jackson on March 9, 2009.

Mr. Freeland said that he grew up in a loving home and had received a good education. He added that he had taken some college classes and had participated in Job Corps. Mr. Freeland stated that he could have returned to his parents' home but that he wanted to make it on his own instead. Finally, Mr. Freeland admitted that he made money committing robberies and that he went to Memphis on the day of Ms. Ward's murder with Mr. Thompson and Ms. Mosley to look for additional places to rob.

After a recess to consider the evidence, the trial court rendered its decision on the issue of punishment for first degree premeditated murder and first degree felony murder. The trial court found that the State had proven the (i)(2), (i)(6), and (i)(7) aggravating circumstances beyond a reasonable doubt and had proven that these aggravating circumstances outweighed the mitigating circumstances beyond a reasonable doubt. Based on these findings, the trial court imposed a sentence of death. The trial court also imposed a twenty-year sentence for Mr. Freeland's conviction for especially aggravated kidnapping and a five-year sentence for his conviction for tampering with evidence, which were to be served consecutively.

The Court of Criminal Appeals affirmed the conviction and sentence. In our mandatory review, we designated the following issues for oral argument: (1) whether the

Court of Criminal Appeals committed error by affirming the trial court's determination that the defendant's confessions were freely and voluntarily made and (2) whether the sentence of death is disproportionate or invalid pursuant to the mandatory review of Tennessee Code Annotated section 39-13-206(c)(1).

## II. Analysis

### A. Motion to Suppress

We first consider Mr. Freeland's claims that the trial court erred in denying his motion to suppress the four statements that he gave to law enforcement officers. Mr. Freeland argues that his statements should have been suppressed because he did not knowingly and voluntarily waive his rights under Miranda prior to giving his statements. Mr. Freeland also contends that his statements should have been suppressed because each was the product of duress and coercion.

In reviewing a ruling on a motion to suppress, the prevailing party "is entitled to the strongest legitimate view of the evidence adduced at the suppression hearing as well as all reasonable and legitimate inferences that may be drawn from that evidence." State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996). Questions of witness credibility, the weight and value of the evidence, and the resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact. Id. "[A] trial court's findings of fact in a suppression hearing will be upheld unless the evidence preponderates otherwise." Id. Our review of a trial court's application of the law to the facts, however, is de novo with no presumption of correctness. State v. Walton, 41 S.W.3d 75, 81 (Tenn. 2001).

At the suppression hearing, the State presented the testimony of Chief Deputy Mark Griffin of the Chester County Sheriff's Department as well as the testimony of Sergeant Kemper, Officer Gilley, and Lieutenant Willis, all of the Jackson Police Department. Their testimony at the suppression hearing closely matched their subsequent testimony at trial.

Deputy Griffin testified about his participation in the investigation into Ms. Ward's murder and his request for assistance from Lieutenant Willis, Sergeant Kemper, and Investigator Wiser, all of the Jackson Police Department's Gang Enforcement Team. Officer Gilley testified about his participation in the stop of Mr. Freeland's vehicle in Jackson. The record does not indicate, however, that Deputy Griffin or Officer Gilley participated in any of Mr. Freeland's four interviews.

Sergeant Kemper testified that the information provided by Deputy Griffin about a blue Buick Roadmaster led to the arrest of Mr. Freeland on March 10, 2009, on the charge of driving on a suspended license. Later in the evening of March 10, 2009, Sergeant Kemper

18

and Lieutenant Willis interviewed Mr. Freeland at the Criminal Justice Center. Sergeant Kemper explained that before the interview began, he presented Mr. Freeland with a rights waiver form in accordance with the Jackson Police Department's standard policy. The form was titled "Your Rights" and included the following language:

> Before we ask you any questions, we want you to understand your rights. You have the right to remain silent. Anything you say can and will be used against you in a court of law. You have the right to talk to a lawyer and have him present with you while you are being questioned. If you cannot afford a lawyer, one will be appointed to represent you before we question you, if you wish one. If you wish to answer questions now, without a lawyer present, you have the right to stop answering questions at any time.

> ### WAIVER

> I have read the statement of my rights shown above. I understand my rights. I am willing to answer questions and make a statement. I do not want a lawyer. I understand and know what I am doing. No promises or threats have been made to me and no pressure of any kind has been used against me.

Sergeant Kemper identified a rights waiver form signed by Mr. Freeland at 8:00 p.m. on March 10, 2009, at the Criminal Justice Center and witnessed by Sergeant Kemper and Lieutenant Willis.

Sergeant Kemper explained that when he interviews a suspect, he asks questions and takes notes to "get a story" about the particular crime. Next, he reduces the notes to a formal, written statement and places boxes throughout the statement where the suspect places his initials indicating that the particular portion of the statement is accurate. Once the suspect has reviewed the statement for accuracy and has made any desired additions, deletions, or corrections, the suspect signs the statement at the bottom. According to Sergeant Kemper, he followed this procedure with Mr. Freeland. Mr. Freeland signed the statement in the presence of Sergeant Kemper and Lieutenant Willis at 12:13 a.m. on March 11, 2009. Mr. Freeland's March 10, 2009 signed statement was made an exhibit to the suppression hearing.[8]

During the March 10, 2009 interview, Sergeant Kemper and Mr. Freeland also discussed a robbery at the Upper Level Hair Salon. On the evening of March 11, 2009,

---

[8] On March 10, 2009, Mr. Freeland also executed a consent to search his 1992 Buick Roadmaster. During the March 10, 2009 interview, Sergeant Kemper also learned that Mr. Freeland was staying with his girlfriend, Nakeisha Carroll. Ms. Carroll executed a consent to search her apartment. Neither the consents nor resulting searches are at issue in this appeal.

Sergeant Kemper returned to interview Mr. Freeland about the salon robbery. Sergeant Kemper followed the standard procedure and again advised Mr. Freeland of his rights. Mr. Freeland signed a rights waiver form dated March 11, 2009, in the presence of Sergeant Kemper and Lieutenant Willis. Lieutenant Willis interviewed Mr. Freeland about the salon robbery and Ms. Ward's homicide. Mr. Freeland's statement about the homicide, which began at 7:10 p.m., was reduced to writing in the method previously described by Sergeant Kemper and signed by Mr. Freeland at 9:43 p.m. on March 11, 2009. Sergeant Kemper read Mr. Freeland's March 11, 2009 statement into the record.

Sergeant Kemper spoke with Mr. Freeland for a third time on March 16, 2009. As with Mr. Freeland's prior statements of March 10 and 11, 2009, Sergeant Kemper advised Mr. Freeland of his rights as explained in the rights waiver form. Mr. Freeland signed the waiver form in the presence of Sergeant Kemper and Lieutenant Willis. Sergeant Kemper followed his standard interview procedure and formalized Mr. Freeland's third statement, which began at 2:00 p.m. and ended at 3:45 p.m. on March 16, 2009. In his statement, Mr. Freeland indicated that during his mother's visit, he told her that he wanted to speak with Lieutenant Willis again "to clear up some confusion from [his] previous statements." Sergeant Kemper read the third statement into the record.

Lieutenant Willis testified that he was present on March 10, 11, and 16, 2009, for each of Mr. Freeland's statements. He recalled that both he and Sergeant Kemper explained the Miranda warnings to Mr. Freeland. Mr. Freeland neither asked questions nor expressed concerns on any of the three occasions and did not ask for an attorney. Lieutenant Willis reviewed the three rights waiver forms signed by Mr. Freeland and confirmed that he witnessed each of the forms. As to the March 16 statement, Lieutenant Willis testified that he received a telephone call from Mr. Freeland's mother who told him that Mr. Freeland wanted to speak with him again.[9]

Following the March 16, 2009 statement, Lieutenant Willis discussed the case with TBI Agent Mark Lewis, who asked him to inquire into Mr. Freeland's willingness to take a polygraph examination. Lieutenant Willis conveyed the TBI's request to Mr. Freeland, and Mr. Freeland agreed to take a polygraph examination. Mr. Freeland was transported to the TBI office on March 17, 2009, where Special Agent Valerie Trout was awaiting his arrival. Lieutenant Willis was present when Special Agent Trout advised Mr. Freeland of his Miranda rights using the form titled "Tennessee Bureau of Investigation Warnings as to Constitutional Rights," which read:

---

[9] Ms. Johnson executed a consent to search Mr. Freeland's room at her home. Neither Ms. Johnson's consent nor the resulting search are at issue in this appeal.

20

Before we ask you any questions, you must understand your constitutional rights: You have the right to remain silent, and you need not answer any questions; If you do answer questions, your answers can be used as evidence against you in court; You have the right to consult with a lawyer before or during questioning; If you cannot afford to hire a lawyer, one will be provided to you without cost; If you decide to answer questions now, without a lawyer present, you will still have the right to stop answering questions at any time until you talk to a lawyer.

WAIVER

I have read, or have had read to me, my constitutional rights. I understand what my rights are, and I am willing to make a statement and answer any questions without a lawyer being present.

According to Lieutenant Willis, Mr. Freeland stated that he understood his rights and signed the waiver form. Both Special Agent Trout and Lieutenant Willis witnessed Mr. Freeland sign the form. Mr. Freeland did not request an attorney.

Lieutenant Willis said that he was not permitted to be in the room during the polygraph examination. After Special Agent Trout gave the Miranda warnings and began to prepare Mr. Freeland for the polygraph examination, Lieutenant Willis went into an adjoining observation room with a one-way mirror where he could view and listen to the conversation. Lieutenant Willis testified that before the polygraph examination began, Mr. Freeland told Special Agent Trout that he "wanted to tell the truth about the situation." He said that Special Agent Trout stopped preparing Mr. Freeland for the polygraph examination and summoned him back into the room.

Lieutenant Willis stated that Special Agent Trout typed Mr. Freeland's statement and that Mr. Freeland was afforded the opportunity to review the statement and make corrections. Mr. Freeland signed the statement in the presence of Special Agent Trout and Lieutenant Willis, who signed as witnesses. The March 17, 2009 statement began at 12:03 p.m. and ended at 1:23 p.m. A copy of the statement was made an exhibit to the suppression hearing.

At the conclusion of the hearing, the trial court found that it was "unchallenged" that Mr. Freeland was advised of his Miranda rights before each of the four statements were given. The trial court found that Mr. Freeland "never once requested an attorney . . . [and] signed the waiver each time." The trial court further concluded that "on each occasion . . . , Mr. Freeland . . . freely, voluntarily, and intelligently waive[d] his rights in this case and gave statements." The trial court also found that the testimony "very clear[ly]" established that Mr. Freeland initiated contact with the officers so that he could give an additional statement

21

or clarify his prior statements. Finally, the trial court found that the officers did not engage in "force or pressure or coercion," and entered a "specific finding that [Mr. Freeland] freely, voluntarily, and intelligently made those waivers and gave those statements."

In its written order denying Mr. Freeland's motion to suppress, the trial court confirmed its verbal findings that the Jackson Police Department advised Mr. Freeland of his constitutional rights pursuant to Miranda before each interview. The trial court concluded that Mr. Freeland therefore "freely, voluntarily, knowingly, and intelligently gave a written adopted statement on each occasion he was questioned." The written order did not reference the March 17, 2009 statement to TBI Special Agent Trout.

At trial, Mr. Freeland sought to suppress his March 17, 2009 statement to Special Agent Trout, alleging for the first time that the statement was coerced because it was induced by the promise that he could take a polygraph examination. Defense counsel conceded that the issue was not raised in the pretrial motion to suppress. The State objected. The trial court recognized that Mr. Freeland failed to raise the issue in his motion to suppress but noted, "I'm always concerned and attentive to questions of possible error." The trial court agreed to allow Mr. Freeland to elicit testimony for this "limited purpose" and stated, "I will give it what weight the court finds it should be given as to the voluntariness of the statement." Mr. Freeland agreed that the State could offer any other evidence it deemed relevant for the limited purpose of the voluntariness of the statement.

The Court of Criminal Appeals concluded that "[t]o the extent that [Mr. Freeland] challenges the voluntariness of his first three statements," the evidence does not preponderate against the trial court's findings at the suppression hearing. Freeland, 2013 WL 2423934, at *17. The intermediate appellate court also concluded that the evidence from the suppression hearing and the trial established that Mr. Freeland "voluntarily waived his Miranda rights before making each statement" and even twice initiated conversations with the investigators. Id. The intermediate appellate court denied relief on this issue, emphasizing Mr. Freeland's admission at trial that he gave each statement voluntarily. Citing Tennessee Rule of Criminal Procedure 12(b)(2)(C), the Court of Criminal Appeals further concluded that Mr. Freeland waived the issue of "coercion by promise of a polygraph examination" because he failed to raise it in his motion to suppress. Id. We must therefore determine whether the Court of Criminal Appeals erred by affirming the trial court's finding that Mr. Freeland's confessions were freely and voluntarily made.

i. Knowing and Voluntary Waiver of Miranda

Mr. Freeland first contends that he did not knowingly and voluntarily waive his rights under Miranda. Both the United States and Tennessee Constitutions recognize a privilege against compelled self-incrimination. See U.S. Const. amend. V (protecting a person from

22

being "compelled in any criminal case to be a witness against himself"); Tenn. Const. art. I, § 9 (guaranteeing that "in all criminal prosecutions, the accused . . . shall not be compelled to give evidence against himself").

In Miranda, the United States Supreme Court established procedural safeguards to secure the Fifth Amendment privilege against self-incrimination. 384 U.S. at 444. Pursuant to Miranda, law enforcement officers are required to warn a person prior to custodial interrogation that

> he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires.

Id. at 479. An interrogation must cease if the suspect invokes his right to remain silent at any time. Id. at 473-74. If a suspect indicates that he wants an attorney, the interrogation must cease until an attorney is present. Id.

After these warnings have been given, a person may "knowingly and intelligently waive these rights and agree to answer questions or make a statement." Id. at 479; see also Edwards v. Arizona, 451 U.S. 477, 484 (1981); North Carolina v. Butler, 441 U.S. 369, 372-76 (1979). "[U]nless and until such warnings and waiver are demonstrated by the prosecution at trial," statements given during custodial interrogation are not admissible in the prosecution's case-in-chief. Miranda, 384 U.S. at 479.

The State bears the burden of proving by a preponderance of the evidence that the defendant waived his rights under Miranda. State v. Climer, 400 S.W.3d 537, 564 (Tenn. 2013); see also Missouri v. Seibert, 542 U.S. 600, 608 n.1 (2004). The State satisfies this burden if, based on the totality of the circumstances surrounding the interrogation, it shows that the waiver was voluntary in that "it was the product of a free and deliberate choice rather than intimidation, coercion, or deception," and was knowing in that it was made "with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." Moran v. Burbine, 475 U.S. 412, 421 (1986); Butler, 441 U.S. at 374-75; Colorado v. Spring, 479 U.S. 564, 573 (1987); Berghuis v. Thompkins, 560 U.S. 370, 382-83 (2010); Climer, 400 S.W.3d at 564-65.

It is undisputed that Mr. Freeland was advised of his Miranda rights before he gave each of his four statements. Both Sergeant Kemper and Lieutenant Willis indicated that the Jackson Police Department and TBI rights waiver forms provided Mr. Freeland with this information. The information contained in both forms substantially complies with the

23

language of Miranda. See Miranda, 384 U.S. at 379. Although Mr. Freeland did not testify at the suppression hearing, he admitted at trial that he was advised of his Miranda rights before each statement.

The rights waiver forms provided Mr. Freeland with the opportunity to waive his Miranda rights. As the testimony revealed, Mr. Freeland signed the rights waiver form before each of the four interviews began. Mr. Freeland's claim that his waiver was not voluntary and knowing is unsupported in this record. In fact, the record is devoid of any evidence that Mr. Freeland was coerced, threatened, or tricked into signing any of the waivers. See Miranda, 384 U.S. at 476 (stating that evidence that the suspect was "threatened, tricked, or cajoled" into a waiver will show that the Fifth Amendment privilege was not voluntarily waived). Furthermore, Mr. Freeland's express waiver after being informed of his Miranda rights is "strong proof of the validity of the waiver." Butler, 441 U.S. at 373. The record unequivocally establishes that Mr. Freeland was fully aware of his Miranda rights and the consequences of his decision to abandon those rights. We therefore conclude that the evidence does not preponderate against the trial court's findings that Mr. Freeland knowingly and voluntarily waived his Miranda rights.

## ii. Voluntariness of His Confessions

In addition to our inquiry into Mr. Freeland's waiver of his Miranda rights, we must also determine whether his subsequent statement or confession was voluntarily given. See Dickerson v. United States, 530 U.S. 428, 432-33 (2000) (indicating that the test to determine the voluntariness of a statement or confession is distinct from the determination concerning a defendant's waiver of his Miranda rights).

In Climer, 400 S.W.3d at 568, we recognized that Miranda requires us to determine whether a suspect was advised of certain enumerated rights and then whether he knowingly and voluntarily waived those rights. 400 S.W.3d at 568. To determine the voluntariness of a confession, however, "the essential inquiry . . . is whether a suspect's will was overborne so as to render the confession a product of coercion." Id.; see also State v. Smith, 933 S.W.2d 450, 455 (Tenn. 1996) ("The test of voluntariness for confessions under article I, § 9 of the Tennessee Constitution is broader and more protective of individual rights than the test of voluntariness under the Fifth Amendment.").

In determining voluntariness of a confession, we must examine the totality of the circumstances surrounding the statement or confession, including "both the characteristics of the accused and the details of the interrogation." Climer, 400 S.W.3d at 568 (quoting Dickerson, 530 U.S. at 434). The circumstances relevant to this determination are:

24

> [T]he age of the accused; his lack of education or his intelligence level; the extent of his previous experience with the police; the repeated and prolonged nature of the questioning; the length of the detention of the accused before he gave the statement in question; the lack of any advice to the accused of his constitutional rights; whether there was an unnecessary delay in bringing him before a magistrate before he gave the confession; whether the accused was injured[,] intoxicated[,] or drugged, or in ill health when he gave the statement; whether the accused was deprived of food, sleep[,] or medical attention; whether the accused was physically abused; and whether the suspect was threatened with abuse.

Id. (alterations in original) (quoting State v. Huddleston, 924 S.W.2d 666, 671 (Tenn. 1996)); State v. Blackstock, 19 S.W.3d 200, 208 (Tenn. 2000) (recognizing that no single factor is necessarily determinative).

Initially, we recognize that Mr. Freeland presented no evidence at the suppression hearing to support the claim that his statements or confessions were involuntarily given, and we are unable to glean such evidence from the record of the hearing. At trial, Mr. Freeland made only veiled references to officers' alleged coercive conduct. For example, Mr. Freeland testified that he felt threatened by the officers during his interviews. The record reveals, however, that the "threats" were actually the officers' challenges to the veracity of Mr. Freeland's answers in light of contradictory evidence discovered during the investigation. Mr. Freeland also stated that he was tired during the first interview and had not been resting well. He provided no evidence to support his claim of sleep deprivation or that any deprivation was the product of police conduct. Similarly, Mr. Freeland suggested that he was deprived of food or drink during the first interview that lasted approximately four hours. Again, he offered no evidence that the officers deprived him of food, that he requested food, or that the officers denied a request for food.

Considering the factors cited in Climer, we observe that Mr. Freeland was twenty-eight years old at the time of trial. He finished high school, completed college courses, and participated in Job Corps. Mr. Freeland was familiar with the legal system through his long history of traffic offenses, including his incarceration for driving on a suspended license. He also committed a series of robberies leading up to Ms. Ward's murder.

None of the interviews were prolonged. Mr. Freeland gave the first statement during his first night in jail after having been arrested for driving on a suspended license. As we have determined, he was advised of his Miranda rights before each interview and voluntarily

25

waived those rights. The record contains no evidence that Mr. Freeland was physically abused, threatened with abuse, or deprived of food, sleep, or medical attention.

Finally, we consider Mr. Freeland's claim that his statement to Special Agent Trout was induced by the promise that he could take a polygraph examination. Although Mr. Freeland challenged generally the voluntariness of all four statements in his pre-trial motion to suppress, he did not raise his claim concerning the polygraph examination until his oral suppression motion at trial. The Court of Criminal Appeals therefore determined that Mr. Freeland waived this issue pursuant to Tennessee Rule of Criminal Procedure 12(b)(2)(C). We disagree. Although waiver is routinely raised in non-capital cases, we have consistently held that "there is no waiver of error directed to the admissibility of evidence when the defendant is under a sentence of death." State v. Duncan, 698 S.W.2d 63, 67-68 (Tenn. 1985).

Consistent with our prior decisions, the trial court permitted Mr. Freeland to elicit testimony concerning the promise of a polygraph examination. The trial court did not specifically reference Duncan or its progeny but stated that it was "attentive to questions of possible error" and indicated that it would "give [this testimony] what weight the court finds it should be given as to the voluntariness of the statement." The trial court did not make specific findings of fact as to Mr. Freeland's oral suppression motion. Because the trial court considered Mr. Freeland's statement to Agent Trout, however, we conclude that the trial court denied the suppression motion.

When the trial court fails to set out its factual findings on the record, the reviewing appellate court must decide "where the preponderance of the evidence lies." See Fields v. State, 40 S.W.3d 450, 457 n.5 (Tenn. 2001). It is undisputed that Mr. Freeland agreed to take a polygraph examination and was transported to the TBI office for that purpose. Mr. Freeland executed a consent form to take the polygraph examination and a rights waiver form, both of which were read aloud to Mr. Freeland.

Special Agent Trout testified that she intended to conduct a polygraph examination but that Mr. Freeland's admission of having murdered Ms. Ward rendered the examination moot. Mr. Freeland testified, however, that he would have admitted to anything because he believed that making those admissions was the only way he would be given a polygraph examination. Mr. Freeland suggested that the polygraph examination would have proven that his admissions to Special Agent Trout were false. As to this credibility dispute, the trial court obviously accredited Special Agent Trout's testimony.

No evidence in this record suggests that the polygraph examination was a ruse to coerce Mr. Freeland into giving a statement or that the officers engaged in any coercive police activity. Colorado v. Connelly, 479 U.S. 157, 167 (1986) (stating that "coercive

26

police activity is a necessary predicate to finding that a confession is not 'voluntary' within the meaning of the Due Process Clause of the Fourteenth Amendment"). We conclude that the evidence does not preponderate against the trial court's implicit denial of Mr. Freeland's oral motion to suppress. Mr. Freeland has therefore failed to establish that the trial court erred by admitting his statement to Special Agent Trout during the trial.

## B. <u>Mandatory Review</u>

Tennessee Code Annotated section 39-13-206(c)(1) (2010) requires us to review the application of the death penalty to determine if:

(A) The sentence of death was imposed in any arbitrary fashion;

(B) The evidence supports the [trial court's] finding of statutory aggravating circumstance or circumstances;

(C) The evidence supports the [trial court's] finding that the aggravating circumstance or circumstances outweigh any mitigating circumstances; and

(D) The sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the nature of the crime and the defendant.

Tenn. Code Ann. § 39-13-206(c)(1).

### i. <u>Arbitrariness of Death Sentence</u>

Our review of the record confirms that the death sentence in this case was not imposed arbitrarily. When the penalty phase began, the trial court accurately recited the capital sentencing procedures established in Tennessee Code Annotated section 39-13-204 as summarized in the Tennessee Pattern Jury Instructions–Criminal 7.04. <u>See also</u> Tenn. Code Ann. § 39-13-205(c) (applying the references to a jury in Tennessee Code Annotated section 39-13-204 to a judge if the jury is waived).

After hearing the evidence and the arguments of counsel, the trial court sentenced Mr. Freeland to death based on his conviction for first degree murder. In this appeal, Mr. Freeland does not contend that the trial court disregarded the facts or circumstances of his case or otherwise misapplied the applicable statutes and procedural rules. We therefore conclude that the death sentence was not imposed in an arbitrary fashion.

## ii. Evidence of Statutory Aggravating Circumstances

We next consider whether the evidence supports the trial court's finding of three statutory aggravating circumstances set forth in Tennessee Code Annotated section 39-13-204(i)(2), (i)(6), and (i)(7).[10]

### a. Tenn. Code Ann. § 39-13-204(i)(2)

The trial court found that the State had proven beyond a reasonable doubt that "[t]he defendant was previously convicted of one (1) or more felonies, other than the present charge, the statutory elements of which involve the use of violence to the person." See Tenn. Code Ann. § 39-13-204(i)(2). The State relied on Mr. Freeland's previous conviction for aggravated robbery, which is a Class B felony. Tenn. Code Ann. §§ 39-13-401, -402 (including the requisite element of theft "by violence or putting the person in fear").

The State introduced Mr. Freeland's statement concerning a March 5, 2009 robbery of a Dollar General Store in Jackson. According to Mr. Freeland's statement, he and Marcus Thompson entered the Dollar General Store wearing bandanas over their faces. Mr. Freeland carried the only gun and ordered the store clerk to give them the money from the cash register. Mr. Freeland testified that the clerk became nervous after she saw his gun. When the cash drawer opened, Marcus Thompson removed approximately eighty dollars from the drawer, and the two men left the store. Mr. Freeland and Mr. Thompson subsequently divided the proceeds. A copy of the resulting indictment for aggravated robbery was made an exhibit to the sentencing hearing.

The State also introduced transcripts of Mr. Freeland's January 4, 2010 guilty plea to aggravated robbery and the February 16, 2010 sentencing hearing. Finally, the State introduced a certified copy of Mr. Freeland's judgment of conviction for the aggravated robbery of the Dollar General Store. From our review of the evidence, we conclude that the trial court correctly found that the State proved the (i)(2) aggravating circumstance beyond a reasonable doubt.

_____

[10] In the "Amended State's Notice of Intent to Seek the Death Penalty and/or A Sentence of Life Without Parole," the State indicated that it would also rely on the (i)(14) aggravating circumstance relating to the vulnerability of the victim. The trial court found, however, that the State failed to prove the existence of this aggravating circumstance beyond a reasonable doubt.

### b. Tenn. Code Ann. § 39-13-204(i)(6)

The trial court also found that the State had proven beyond a reasonable doubt that "[t]he murder was committed for the purpose of avoiding, interfering with, or preventing a lawful arrest or prosecution of the defendant or another." Tenn. Code Ann. § 39-13-204(i)(6). This aggravating circumstance focuses on a defendant's motives for killing the victim. See State v. Reid, 164 S.W.3d 286, 315 (Tenn. 2005). In proving the (i)(6) aggravating circumstance, the State is not required to prove that the defendant's only motive for murdering the victim was his desire to avoid arrest or prosecution. See State v. Henderson, 24 S.W.3d 307, 314 (Tenn. 2000). Instead, the State must only show that avoiding arrest or prosecution was "one of the [defendant's] motives in the killing." Id.; Terry v. State, 46 S.W.3d 147, 162 (Tenn. 2001); State v. Hartman, 42 S.W.3d 44, 58 (Tenn. 2001); State v. Smith, 868 S.W.2d 561, 581 (Tenn. 1993); State v. Carter 714 S.W.2d 241, 250 (Tenn. 1986).

Hywon Reed, the State's rebuttal witness during the guilt phase, testified that he briefly shared a jail cell with Mr. Freeland in Jackson and that Mr. Freeland engaged in a conversation with him about the circumstances of his indicted offenses. Mr. Reed sent a letter to the district attorney's office outlining the details of the conversation. According to Mr. Reed's letter and trial testimony, Mr. Freeland described how he, his friend, and his friend's girlfriend carjacked a white woman in Chester County. Mr. Freeland forced the woman to drive the car to the side of an isolated road and asked her about ATM cards and money. Mr. Freeland told Mr. Reed that it angered him when the woman refused to give him PIN numbers or otherwise cooperate. He also explained to Mr. Reed that the woman had a cell phone and told him that she was going to call the police and report them for kidnapping her. He also told Mr. Reed that he shot the woman in the back of the head with her face to the ground and that he had to kill the woman because she could identify them. We conclude that this evidence established that at least one motive for the killing was to avoid lawful arrest or prosecution. Accordingly, the trial court correctly found that the State proved the (i)(6) aggravating circumstance beyond a reasonable doubt.

### c. Tenn. Code Ann. § 39-13-204(i)(7)

Finally, the trial court found that the State had proven beyond a reasonable doubt that "[t]he murder was knowingly committed, solicited, directed, or aided by the defendant, while the defendant had a substantial role in committing or attempting to commit any . . . robbery." Tenn. Code Ann. § 39-13-204(i)(7). The State relied on aggravated robbery as the underlying felony offense, not the indicted offense of aggravated kidnapping. Accordingly, we must review the evidence to determine if Mr. Freeland "knowingly" murdered Ms. Ward while he had a substantial role in committing or attempting to commit aggravated robbery.

29

No culpable mental state is required for a felony murder conviction other than the intent required to commit the underlying felony. Tenn. Code Ann. § 39-13-202(a)(2), (b), First degree premeditated murder, however, requires that the killing be "premeditated and intentional." Tenn. Code Ann. § 39-13-202(a)(1). Mr. Freeland was convicted of both first degree felony murder and first degree premeditated murder. We therefore conclude that the evidence establishing Mr. Freeland's premeditated and intentional killing of Ms. Ward, which is the highest culpable mental state, is sufficient to establish the lesser culpable mental state of "knowing" required by the (i)(7) aggravating circumstance. See Tenn. Code Ann. §§ 39-11-301, -302 (defining the hierarchy of culpable mental states in Tennessee and providing that the knowing culpable mental state is also established if a person acts intentionally).

We next consider whether the evidence is sufficient to show that the "knowing" murder of Ms. Ward was committed during an aggravated robbery. We must "view[] the evidence in the light most favorable to the prosecution" to determine whether "any rational trier of fact could have found the essential elements of [aggravated robbery] beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979).

Aggravated robbery is a Class B felony and is defined as "the intentional or knowing theft of property from the person of another by violence or putting the person in fear . . . (1) [a]ccomplished with a deadly weapon . . . or (2) [w]here the victim suffers serious bodily injury." Tenn. Code Ann. §§ 39-13-401, -402. The evidence adduced at trial revealed that Mr. Freeland knowingly exercised control over property owned by Ms. Ward without her effective consent and with the intent to deprive her of the property. Specifically, Mr. Freeland took Ms. Ward's automobile because he, Marcus Thompson, and Tashondra Mosley needed a vehicle to drive to Memphis to commit robberies. Displaying a weapon, Mr. Freeland ordered Ms. Ward to drive to a secluded road against her will. By his own admission, Mr. Freeland shot Ms. Ward in the head and drove away in her vehicle. Eventually, other items belonging to Ms. Ward were recovered in Mr. Freeland's possession.

Without question, the evidence is sufficient to establish that Ms. Ward's murder was "knowingly" committed while Mr. Freeland had a substantial role in committing or attempting to commit aggravated robbery. We therefore affirm the trial court's finding that the State proved the (i)(7) aggravating circumstance beyond a reasonable doubt.

### iii. Weighing Aggravating and Mitigating Circumstances

We next consider whether the evidence supports the trial court's finding that the aggravating circumstances outweighed any mitigating circumstances beyond a reasonable doubt. The trial court noted at the beginning of the sentencing hearing that before a sentence of death or a sentence of imprisonment for life without the possibility of parole could be

30

imposed, the court must find that the State proved beyond a reasonable doubt the existence of one or more statutory aggravating circumstances.

The trial court found that the State had proven beyond a reasonable doubt the (i)(2), (i)(6), and (i)(7) aggravating circumstances. In mitigation, Mr. Freeland proposed two statutory mitigating circumstances. First, Mr. Freeland argued that he "was an accomplice in the murder committed by another person and [his] participation was relatively minor." Tenn. Code Ann. § 39-13-204(j)(5). Second, Mr. Freeland maintained that he "acted under extreme duress or under the substantial domination of another person." Tenn. Code Ann. § 39-13-204(j)(6). Mr. Freeland also presented the testimony of his mother, stepfather, and younger brother. The testimony was supplemented with photographs, certificates, and numerous letters of support from community members and friends. Mr. Freeland's counsel urged the trial court to consider any residual doubt as to Mr. Freeland's guilt and to "choose life."

Our standard of review requires us determine whether a rational trier of fact could find that the aggravating circumstances outweigh the mitigating circumstances beyond a reasonable doubt when the evidence is taken in the light most favorable to the State. State v. Stephenson, 195 S.W.3d 574, 593 (Tenn. 2006) (abrogated on other grounds by State v. Watkins, 362 S.W.3d 530 (Tenn. 2012)). We concluded in the previous section that the evidence was sufficient to support the trial court's finding of the three statutory aggravating circumstances. We have reviewed the statutory mitigating circumstances and the remaining mitigation evidence presented. We conclude that viewing the evidence in the light most favorable to the State, a rational trier of fact could have found that the (i)(2), (i)(6), and (i)(7) aggravating circumstances outweighed the mitigating circumstances beyond a reasonable doubt.

## iv. Proportionality of Death Sentence

Finally, we consider whether Mr. Freeland's sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the nature of the crime and the defendant. Tenn. Code Ann. § 39-13-206(c)(1)(D). Our comparative proportionality review standards formalized in State v. Bland, 958 S.W.2d 651 (Tenn. 1997), were recently affirmed by a majority of this Court in State v. Pruitt, 415 S.W.3d 180 (Tenn. 2013).

We continue to utilize as the pool of similar cases those in which a capital sentencing hearing was conducted to determine whether the sentence should be death, life imprisonment without the possibility of parole, or life imprisonment, regardless of the sentence returned by the jury. Bland, 958 S.W.2d at 666. The factors relevant to the process of identifying and comparing similar cases include (1) the means of death; (2) the manner of death; (3) the

31

motivation for the killing; (4) the place of death; (5) the similarity of the victims' circumstances including age, physical and mental conditions, and the victims' treatment during the killing; (6) the absence or presence of premeditation; (7) the absence or presence of provocation; (8) the absence or presence of justification; and (9) the injury to and effects on non-decedent victims. Id. at 667. The relevant criteria when comparing the characteristics of defendants include the defendant's (1) prior criminal record or prior criminal activity; (2) age, race, and gender; (3) mental, emotional, or physical condition; (4) involvement or role in the murder; (5) cooperation with authorities; (6) remorse; (7) knowledge of helplessness of victim(s); and (8) capacity for rehabilitation. Id.

We now consider whether Mr. Freeland's case, taken as a whole, is plainly lacking in circumstances consistent with cases in which the death penalty was imposed. Id. at 665. Mr. Freeland is an African American male from Madison County. He was twenty-four years old when he committed these offenses. He joined two others in a plan to steal someone's car to commit robberies in Memphis. These three individuals parked outside a discount store and chose a sixty-one-year-old, obese, female victim whose vehicle was parked in a handicapped space. Mr. Freeland displayed a gun and ordered the victim to drive him and his co-defendants to a remote area. The victim did not cooperate with Mr. Freeland and threatened to call the police to report them for kidnapping. Mr. Freeland knew that the victim had a cell phone, but he could not locate it. Fearing that the victim would report and identify him to police, Mr. Freeland fired a single gunshot into the back of the victim's head while she was lying face down along the edge of the roadway.

According to one of his statements, Mr. Freeland was congratulated by Mr. Thompson for achieving the status of "Original Baby Gangster" for the victim's murder. Some of the victim's possessions were found inside Mr. Freeland's residence and in his co-defendants' residences. These items were taken from the victim's vehicle before it was set afire in a field. Mr. Freeland gave four separate statements with differing accounts of the events surrounding the victim's death. In the first three statements, Mr. Freeland was a participant but not the killer. In his fourth statement, however, Mr. Freeland explained in detail how he shot the victim in the back of her head. At a bench trial, Mr. Freeland's testimony was contrary to the remaining evidence. He admitted minimal participation in the burning of the victim's vehicle. He maintained, however, that Mr. Thompson killed the victim. Mr. Freeland expressed remorse for the role he played in burning the vehicle. The trial court found Mr. Freeland guilty of first degree premeditated murder, first degree felony murder, especially aggravated kidnapping, and tampering with evidence.

At the penalty phase, the State presented evidence that Mr. Freeland had a prior conviction for an aggravated robbery that occurred just days before Ms. Ward's murder. Mr. Freeland presented the family members' testimony and letters from various community

members. The trial court found Tennessee Code Annotated section 39-13-204(i)(2), (i)(6), and (i)(7) as aggravating circumstances and imposed the death penalty.

We next consider prior capital cases with similarities to Mr. Freeland's case based on the Bland criteria. We are mindful that comparative proportionality review is not a rigid, objective test and that we must also rely on the experienced judgment and intuition of the members of the reviewing court. Bland, 958 S.W.2d at 668.

In State v. Powers, 101 S.W.3d 383, 388 (Tenn. 2003), the defendant, a forty-two-year-old Asian male, followed the female victim from Tunica to Memphis where he abducted her from her father-in-law's driveway. The defendant took the victim to an abandoned house and shot her in the back of the head. Id. at 389. The defendant robbed the victim of her gambling winnings and jewelry and left her body in a storage room. Id. The jury convicted the defendant of felony murder. Id. at 390. During the penalty phase, the State presented victim impact evidence and introduced evidence of the defendant's prior felony convictions. Id. In mitigation, the defendant presented the testimony of his first wife who described the defendant as a good student and athlete and as quiet and withdrawn but polite. Id. She pleaded for his life so that he could meet his two grandchildren. Id. The jury imposed a death sentence based on the (i)(2), (i)(6), and (i)(7) aggravating circumstances. Id. at 391; see also Tenn. Code Ann. § 39-13-204(i)(2), (6), (7) (Supp. 1996).

In State v. Stout, 46 S.W.3d 689, 693 (Tenn. 2001), the defendant and three co-defendants abducted a twenty-six-year-old woman from her driveway and forced her into the backseat of their vehicle at gunpoint. The men drove the victim to an isolated location and shot her once in the head. Id. After taking a suitcase from the victim's car, the defendant left the area. Id. In his statement, the defendant said that he was a member of the "Gangster Disciples." Id. at 695. The defendant was convicted of first degree felony murder, especially aggravated kidnapping, and especially aggravated robbery. Id. at 694-95. During the penalty phase, the State introduced evidence of the defendant's prior felony conviction for especially aggravated robbery. Id. at 695. The defendant presented several witnesses including the defendant's mother who testified that she was an exotic dancer and prostitute when she became pregnant with the defendant. Id. The defendant's grandmother testified that she raised the defendant as one of her own and took him to church every Sunday. The jury imposed a sentence of death based on the (i)(2), (i)(6), and (i)(7) aggravating circumstances. Id. at 696; see also Tenn. Code Ann. § 39-13-204(i)(2), (6), (7) (Supp. 1995).

In State v. Young, 196 S.W.3d 85, 96 (Tenn. 2006), the defendant, a white male from Shelby County, carjacked the victim while she was sitting alone in her car at a stop sign. The defendant forced the victim into the passenger seat and drove to a remote location in another county. Id. While there, the defendant stabbed the victim in the back then concealed her body under a sheet of tin near an old fuel tank. Id. The defendant left the victim to die and

drove away in her vehicle. The knife wounds caused the victim's death within a matter of minutes. Id. at 98-99. The jury convicted the defendant of theft under $10,000, especially aggravated kidnapping, and first degree premeditated murder. Id. at 99. During the penalty phase, the State introduced victim impact evidence and evidence of the defendant's prior convictions for robbery with a deadly weapon, rape, kidnapping, manslaughter, and robbery in the first degree. Id. at 99-101. The jury found the existence of the (i)(2), (i)(6), and (i)(7) aggravating circumstances and imposed a sentence of death. Id. at 101; see also Tenn. Code Ann. § 39-13-204(i)(2), (6), (7).

After reviewing prior decisions and comparing his case with similar cases, we conclude that Mr. Freeland's case, taken as a whole, is not plainly lacking in circumstances consistent with other cases in which the death penalty has been imposed. Accordingly, Mr. Freeland's sentence of death is not disproportionate.

## IV. Conclusion

We have reviewed the issues raised by Mr. Freeland and conclude that they do not warrant relief. As to the issues raised in this Court but not addressed in this opinion, we affirm the decision of the Court of Criminal Appeals. Relevant portions of that opinion are published hereafter as an appendix. We remand the case to the trial court, however, for the entry of a corrected judgment reflecting the merger of count two into count one for a single conviction for first degree murder. In accordance with Tennessee Code Annotated section 39-13-206(c)(1) and the principles adopted in prior decisions, we have considered the entire record in this case and conclude that the sentence of death has not been imposed arbitrarily, that the evidence supports the trial court's finding of the statutory aggravating circumstances beyond a reasonable doubt, that the evidence supports the trial court's finding that the aggravating circumstances outweigh any mitigating circumstances beyond a reasonable doubt, and that the sentence is not excessive or disproportionate. The sentence of death shall be carried out as provided by law on the 6th day of October, 2015, unless otherwise ordered by this Court or other proper authority. It appearing that the defendant, John T. Freeland, Jr., is indigent, the costs of this appeal are taxed to the State of Tennessee.

_____
JANICE M. HOLDER, JUSTICE

34

# Appendix

## (Excerpts from the Decision of the Court of Criminal Appeals)

IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
January 9, 2013 Session

**STATE OF TENNESSEE v. JOHN T. FREELAND, JR.**

**Direct Appeal from the Circuit Court for Madison County, Tennessee
No. 10-409, Roy B. Morgan, Jr., Judge**

**No. W2011-01828-CCA-R3-DD**

THOMAS T. WOODALL, J., delivered the opinion of the Court, in which JERRY L. SMITH and D. KELLY THOMAS, JR., JJ. joined.

A. Russell Larson and Angela Hopson, Jackson, Tennessee, for the appellant, John T. Freeland, Jr.

Robert E. Cooper, Jr., Attorney General and Reporter; Leslie E. Price, Assistant Attorney General; James G. Woodall, District Attorney General; and Jody S. Pickens, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

[Analysis]

### *Sufficiency of the Evidence*

Next, the Defendant argues that the evidence is insufficient to support his convictions of first degree premeditated murder, felony murder committed in the perpetration of an especially aggravated kidnapping, and especially aggravated kidnapping. The Defendant does not challenge the sufficiency of the evidence to support his conviction of tampering with the evidence. The Defendant contends that the State failed to establish the *corpus delicti* arguing that "the Defendant's conviction was based solely on the Defendant's confession." The State argues that the evidence sufficiently established the Defendant's convictions.

When an accused challenges the sufficiency of the convicting [*47] evidence, our standard on review is whether, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S. Ct. 2781, 2789, 61 L. Ed. 2d 560 (1979). The trier of fact, not this Court, resolves questions concerning the credibility of witnesses and the weight and value to be given the evidence as well as all factual issues raised by the evidence. *State v. Tuttle*, 914 S.W.2d 926, 932 (Tenn. Crim. App. 1995). Nor may this Court reweigh or re-evaluate the evidence. *State v. Cabbage*, 571 S.W.2d. 832, 835 (Tenn. 1978). On appeal, the State is entitled to the strongest legitimate view of the evidence and all inferences therefrom. *Id*. Because a verdict of guilt removes the presumption of innocence and replaces if with a presumption of guilt, the accused has the burden in this Court of illustrating why the evidence is insufficient to support the verdict returned by the trier of fact. *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). "[D]irect and circumstantial evidence should be treated the same when weighing the sufficiency of [the] evidence." *State v. Dorantes*, 331 S.W.3d 370, 381 (Tenn. 2011).

Premeditated [*48] first degree murder is "[a] premeditated and intentional killing of another[.]" Tenn. Code Ann. § 39-13-202(a)(1). Premeditation "is an act done after the exercise of reflection and judgment. 'Premeditation' means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time." Tenn. Code Ann. § 39-13-202(d). The element of premeditation is a question of fact to be determined by the jury. *State v. Suttles*, 30 S.W.3d 252, 261 (Tenn. 2000); *State v. Bland*, 958 S.W.2d 651, 660 (Tenn. 1997). Premeditation "may be established by proof of the circumstances surrounding the killing." *Suttles*, 30 S.W.3d at 261. The Tennessee Supreme Court noted that there are several factors which tend to support the existence of premeditation, including the use of a deadly weapon upon an unarmed victim, the fact that the killing was particularly cruel, declarations of an intent to kill by the defendant, evidence of procurement of a weapon, the making of preparations before the killing for the purpose of concealing the crime, and calmness immediately after the killing. *Id*.; *see Bland*, 958 S.W.2d at 660.

Felony [*49] murder is "[a] killing of another committed in the perpetration or attempt to perpetrate any . . . kidnapping. . . ." Tenn. Code Ann. § 39-13-202(a)(2).

"Especially aggravated kidnapping is false imprisonment, as defined in § 39-13-302, [w]here the victim suffers serious bodily injury." Tenn. Code Ann. § 39-13-305. False imprisonment is the knowing removal or confinement of "another unlawfully so as to interfere substantially with the other's liberty." Tenn. Code Ann. § 39-13-302.

The Defendant argues that the State failed to establish the *corpus delicti* in that his conviction is based solely upon his uncorroborated confession. As recently noted by our

2

supreme court, "a criminal conviction cannot be based *solely* on a defendant's uncorroborated confession." *State v. Wagner*, 382 S.W.3d 289, 297-98 (Tenn. 2012) (citing *State v. Banks*, 271 S.W.3d 90, 140 (Tenn. 2008); *State v. Housler*, 193 S.W.3d 476, 490 (Tenn. 2006); *State v. Smith*, 24 S.W.3d 274, 282 (Tenn. 2000); *Ashby v. State*, 124 Tenn. 684, 139 S.W. 872, 875 (1911); *Williams v. State*, 80 Tenn. 211, 212-13 (1883)). In *Wagner*, the court explained that "th[e] rule requiring corroboration of a confession is known as the *corpus delicti* [*50] rule." *Id*. at fn 9 (citing *United States v. Brown*, 617 F.3d 857, 860 (6th Cir. 2010)). As the court also noted in *Wagner*, we are cognizant that the issue of whether the *corpus delicti* rule should be abrogated or modified is presently pending before the supreme court. *State v. Bishop*, No. W2010-01207-SC-R11-CD, 2012 Tenn. LEXIS 522 (Tenn. Aug. 15, 2012) (order granting Tennessee Rule of Appellate Procedure 11 application and requesting additional briefing concerning the *corpus delicti* rule). In any event, we conclude that the *corpus delicti* rule does not garner the Defendant any relief because his confession was sufficiently corroborated by physical evidence and witness testimony.

Eyewitness testimony placed the Defendant in Henderson in the company of Mr. Thompson and Ms. Mosely on the day of the victim's murder. Surveillance video recordings admitted at trial established the Defendant's presence and participation in the initial kidnapping of the victim, as well as the Defendant's presence with Mr. Thompson throughout the day. Gunshot residue, ballistic evidence, and fingerprint evidence likewise revealed the Defendant's involvement in the offenses. In addition to the Defendant's admissions to investigators [*51] and to a cell mate that he shot the victim, the record as a whole sufficiently established the Defendant's guilt of the first degree murder and especially aggravated kidnapping.

Having found the evidence sufficient to support the Defendant's convictions, we do note, however, that the trial court failed to merge the felony murder conviction into the premeditated murder conviction at sentencing. *See State v. Cribbs*, 967 S.W.2d 773, 788 (Tenn. 1998) ("Obviously, when only one person has been murdered, a jury verdict of guilt on more than one count of an indictment charging different means of committing first degree murder will support only one judgment of conviction. . . ."). Accordingly, we direct the trial court to correct the judgments on remand to effectuate proper merger of the convictions.

*Constitutionality of the Death Penalty and Proportionality Review*

In his final issue, the Defendant lodges myriad attacks upon the constitutionality of the death penalty under both the Eighth and Fourteenth Amendments of the United States Constitution and Article I, sections Eight and Sixteen of the Tennessee Constitution. The Defendant, however, fails to cite to any authority in support of his arguments. For this reason, we could deem these issues waived. *See* Tenn. Ct. Crim. App. R. 10(b) ("Issues

3

which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court."). That being said, we choose to review each claim as outlined in the Defendant's brief.

First, the Defendant contends "that the death sentence infringes upon his fundamental right to life." This argument has been rejected previously by our supreme court. *State v. Hester*, 324 S.W.3d 1, 78-79 (Tenn. 2010).

The Defendant contends that Tennessee's death penalty statutes fail to "sufficiently narrow the population of defendant convicted of first degree murder who are eligible for a sentence of death." Our supreme court has rejected this argument. *Terry v. State*, 46 S.W.3d 147, 159 (Tenn.), [*57] *cert. denied*, 534 U.S. 1023, 122 S. Ct. 553, 151 L. Ed. 2d 428 (2001).

The Defendant argues that Tennessee's death penalty statutes fail to "limit the exercise of the [trier of fact's] discretion because, once the [trier of fact] finds aggravation it can impose a death sentence no matter what mitigation is shown." This argument has been rejected by our supreme court. *State v. Smith*, 857 S.W2d 1, 21-22 (Tenn. 1993).

The Defendant argues that Tennessee's death penalty statutes unconstitutionally mandate the trier of fact to impose the death penalty upon a finding that the aggravating circumstances outweigh the mitigating circumstances. This argument has been rejected by our supreme court. *State v. Boyd*, 797 S.W.2d 589, 596 (Tenn. 1990), *cert. denied*, 498 U.S. 1074, 111 S. Ct. 800, 112 L. Ed. 2d 861 (1991).

The Defendant argues that Tennessee's death penalty statute is unconstitutional because it fails to "require the [trier of fact] to make the ultimate determination that death is appropriate." This argument has been rejected by our supreme court. *State v. Hall*, 958 S.W.2d 679, 718 (Tenn. 1997); *State v. Brimmer*, 876 S.W.2d 75, 87 (Tenn. 1994).

The Defendant contends that Tennessee's death penalty statutes fail to "inform the [trier of fact] of its ability [*58] to impose a life sentence out of mercy." This argument has been rejected by our supreme court. *State v. Cauthern*, 967 S.W.2d 726, 749 (Tenn. 1998); *State v. Cazes*, 875 S.W.2d 253, 269 n.6 (Tenn. 1994).

The Defendant argues that Tennessee's death penalty statutes unconstitutionally "prohibit the [trier of fact] from being informed of the consequences of its failure to reach a unanimous verdict in the penalty phase." This argument has also been rejected by our supreme court. *Terry*, 46 S.W.3d at 170; *Brimmer*, 876 S.W.2d at 87; *Cazes* 875 S.W.2d at 268.

4

The Defendant argues that the death penalty is cruel and unusual punishment and that lethal injection, specifically, is cruel and unusual. Both arguments have been rejected by our courts. *State v. Keen*, 31 S.W.3d 196, 233 (Tenn. 2000), *cert. denied*, 532 U.S. 907, 121 S. Ct. 1233, 149 L. Ed. 2d 142 (2001) (rejecting general argument that the death penalty is cruel and unusual); *State v. Banks*, 271 S.W.3d 90, 108 (Tenn. 2008) (rejecting specific claim that lethal injection is cruel and unusual). Furthermore, the Supreme Court has rejected the same challenge to Kentucky's lethal injection protocol. *Baze v. Rees*, 553 U.S. 35, 128 S. Ct. 1520, 170 L. Ed. 2d 420 (2008).

The Defendant argues that the death penalty [*59] is imposed in Tennessee in a capricious, arbitrary, and discriminatory manner "on the basis of race, sex, geographic region and economic and political status of the defendant." This argument has been rejected by our supreme court. *State v. Thomas*, 158 S.W.3d 361, 407 (Tenn. 2005); *State v. Hines*, 919 S.W.2d 573, 582 (Tenn. 1995).

In his final attack on the constitutionality of Tennessee's death penalty scheme, the Defendant argues that the statutes erroneously allow the State to make final closing arguments to the [trier of fact] during the sentencing phase of the trial. This argument has been rejected numerous times. *Brimmer*, 876 S.W.2d at 87; *Cazes*, 875 S.W.2d at 269; *State v. Caughron*, 855 S.W.2d 526, 542 (Tenn. 1993).

5