IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
January 7, 2026 Session

## STATE OF TENNESSEE v. KEYLONE JONES

**Appeal from the Criminal Court for Shelby County**
No. 19-04513    Jennifer Fitzgerald, Judge
_____

### No. W2024-01542-CCA-R3-CD
_____

The Defendant was indicted for one count of first degree premeditated murder for the shooting death of the victim, Michael Hawkins, Jr. Prior to trial, the Defendant filed two motions to suppress his statement to the police, both of which the trial court denied. The trial court granted the Defendant's motion to suppress a photographic line-up identification. The case proceeded to a jury trial, and the jury convicted the Defendant of second degree murder. The trial court subsequently sentenced the Defendant to twenty years of imprisonment. In this appeal, the Defendant contends that the trial court erred by refusing to suppress his statement. The Defendant also contends that the trial court erred by allowing one of the trial witnesses to identify him in court. Upon our review, we affirm the Defendant's conviction and sentence. We remand this matter for the entry of a corrected judgment order.

**Tenn R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed;
Remanded for Entry of Corrected Judgment**

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which J. ROSS DYER, and MATTHEW J. WILSON, JJ., joined.

Terrell L. Tooten, Memphis, Tennessee (on appeal and at trial); and C. Alex Jones, Cordova, Tennessee (at trial), for the appellant, Keylone Jones.

Jonathan Skrmetti, Attorney General and Reporter; Ronald L. Coleman, Senior Assistant Attorney General; Steven J. Mulroy, District Attorney General; and Jimmy Thomas, William Cranford, Kevin McAlpin, and Leslie Fouche, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

### Factual Background

On October 9, 2018, a group of three men shot at the 16-year-old victim, Michael Hawkins, Jr., as he sat on his front porch. The victim died as a result of one of his gunshot wounds. The next day, the Defendant was taken into custody and questioned. He gave a statement implicating himself as one of the shooters.

Prior to trial, the Defendant filed a motion to suppress his statement on the basis that it was involuntary. Specifically, the Defendant contended in his motion that he wanted his mother present during questioning and that he did not want to speak with officers unless she was there. He also contended that

> the police officers misinformed [him], and told him that if he did not talk to them in that moment, without his mother present, then they were going to take him to jail to serve 51 years. Defendant believed this statement to be true. It was based on this coercion, and ignoring of his rights, that Defendant gave a statement.

At the hearing on this motion, the following proof was adduced.

Detective Ronnie Elrod of the Memphis Police Department Homicide Bureau testified that, on October 10, 2018, he was investigating the homicide of the victim. After speaking with the victim's younger brother, M. H.,[1] Det. Elrod developed the Defendant as a suspect in the homicide.

Det. Elrod spoke with the Defendant at the police department, where the Defendant had arrived at approximately 2:00 in the afternoon. He was placed in an interview room and chained by his ankle to the table. At the time, the Defendant was seventeen years old, one month shy of his eighteenth birthday. Prior to interrogating the Defendant, Det. Elrod called the Defendant's mother on the phone. This phone call was placed at approximately 2:30 in the afternoon. The Defendant's mother answered the call, and Det. Elrod explained to her that the Defendant was with him, that he intended to interview the Defendant, and that he needed her "to come down, you know, to sit with him while he's being interviewed." Det. Elrod testified that the Defendant's mother responded as follows:

> She said she had a – I'm not sure either it was a midterm or a final exam that she had to be at, at like five o'clock and she couldn't miss it. And we talked about it and I said well, you know, you should come on down and she said, well, I said because we need to talk to him and she said well let me find out what I can work out but ya'll can go ahead and talk to him.

---

[1] Because this witness was a minor at the time of the shooting, we refer to him by his initials.

The Defendant's mother then hung up.

In order to give the Defendant's mother an opportunity to reschedule her test, Det. Elrod waited about an hour in order to hear back from her. When he did not, he called her again. The call went to voicemail, and he left a message. Det. Elrod then began his interview of the Defendant.

Initially, Det. Elrod had the Defendant read aloud "his rights" and made sure he understood them. The Defendant then read and signed a waiver of his rights. The Defendant's signed waiver was admitted into evidence. The waiver shows that Det. Elrod signed it at 3:58 p.m. The waiver also shows that the Defendant was a month shy of his eighteenth birthday and had dropped out of school in the eleventh grade.

According to Det. Elrod, at no point during the interview did the Defendant say that he did not want to speak to the officer unless his mother was present. Nor did the Defendant ever request an attorney. Det. Elrod testified that he saw nothing to indicate that the Defendant was under the influence of alcohol or drugs. At no point in their conversations did either the Defendant or the Defendant's mother indicate that the Defendant suffered from any mental infirmity.

Det. Elrod testified that the Defendant had previously been arrested as a juvenile.

According to Det. Elrod, the Defendant's mother called "a few hours after" the Defendant arrived at the police station. She told him that "she had car problems and she went ahead and went on to class." She did not tell Det. Elrod that she wanted him to cease talking to the Defendant. She did not say that she wanted Det. Elrod to wait until she got to the police station before he began speaking with the Defendant. She later called again and said she was on her way to the police station. After she arrived, she did not complain about the officers having spoken with the Defendant.

In conjunction with the interview, the Defendant made a written statement, initialing each page to indicate its accuracy. In his statement, the Defendant admitted to being one of three persons who shot at the victim. Det. Elrod described the Defendant's demeanor during the interview as "calm." During the interview, the Defendant accepted "water, Dr. Pepper, and some Ruffles." Sgt. Jensen was also present during the interview.

Det. Elrod explained that he began typing the Defendant's verbal statement at 6:03 p.m. The written statement, admitted into evidence, shows that the Defendant adopted it at approximately 7:08 p.m.

Det. Elrod denied telling the Defendant that, if he did not cooperate, he would "do life." He denied threatening or acting aggressively toward the Defendant. He testified that the Defendant's mother arrived after the Defendant had signed his written statement and that she was allowed to see the Defendant before he was transported to the Juvenile Detention Center.

Sergeant Erik Jensen of the Memphis Police Department testified that he assisted Det. Elrod in the investigation of the victim's homicide. He was present during the Defendant's interview at the police station. Sgt. Jensen reiterated the process by which the Defendant read aloud the advice of rights form, and he stated that he and Det. Elrod explained the word "coercion" to the Defendant. Sgt. Jensen denied that he threatened the Defendant in any way. He never heard the Defendant request the presence of either his mother or an attorney. He acknowledged that Det. Elrod told the Defendant that his mother was not going to be there during the interview.

The Defendant's mother, Quantessa Hutchinson, testified that she recalled getting a telephone call from a police officer informing her that the Defendant was in custody and that she "needed to come downtown." She stated that she got the phone call while she was in class, which started at 6 or 6:30 p.m. The class lasted two hours. She told the officer that she would be there "as soon as class was over." She stated that she told the officer that she wanted to be present while the Defendant was interviewed. She testified that the officer "told me either I was going to be there or not or – because – more or less, they were going to go ahead without me, regardless if I was there or not."

On cross-examination, Ms. Hutchinson stated that "they" called her several times while she was in class between 6:00 p.m. and 8:30 p.m. She explained to them that she could not leave until after her class was over, but she would come then. She testified that she was not allowed to see the Defendant after she arrived at the police station. She acknowledged that the Defendant had previously been arrested several times, including during the years 2013, 2015, 2017, and 2018.

Upon being questioned by the trial court, Ms. Hutchinson denied telling the police that she was taking a test. She stated that she told the officer that she was turning in class work. She told the officer that she would head to the station as soon as her class was over at 8:00 or 8:30. She added that she called the officer as soon as class was over and stated that she was on her way.

The trial court issued a written order denying the Defendant's motion to suppress. The trial court stated,

When looking at the circumstances surrounding the Defendant's statement, it is clear under a totality of the circumstances that the Defendant made his statement voluntarily after being apprised of his rights, understanding those rights, and waiving them freely and voluntarily.

The [D]efendant did not present evidence that he did not understand the [M]iranda advice of rights.

Following the trial court's denial of his motion to suppress, the Defendant filed a second motion to suppress his statement, alleging that, "once Defendant was in police custody, the police delayed too long in taking Defendant to juvenile court, or a detention facility, opting instead to detain Defendant in police custody in order to obtain a confession." The Defendant contended in his motion that he was held at the police station for over five hours, a period of time he described as "unreasonable" and an "illegal detention," therefore requiring that his statement be suppressed.

On the same day, the Defendant filed a motion to suppress a photographic identification of him.

At the hearing on these two motions, M. H. testified that he was the victim's brother. He was present at the time his brother was shot and killed. At that time, he knew the Defendant as "Nu Nu." He had seen the Defendant previously at Hamilton High School some months prior and had also seen him two days before the shooting and again on the day before the shooting. Two days before the shooting, M.H. saw the Defendant in the evening while the Defendant was going "over some female's house." On the next evening, the night before the shooting, he and his brother, the victim, were sitting on their front porch. A black Impala drove by, and he saw the Defendant in the car. The Defendant leaned out of the front seat passenger window and said, "where the op[p]s at?" The car drove up the street, turned around, and came back by. This time, the Defendant said, "a bullet ain't got no name on it." M. H. said that the Defendant was armed at this time with a "silver and black 40." The car then drove off.

The next night, he and the victim were again sitting on the porch. It was sometime around 8:00 p.m. There were street lights on as well as porch lights. M. H. went into the house to get a drink of water. As he was returning to the porch but still in the house, he heard 15 to 20 gunshots and heard his brother scream. He looked out the window and saw the Defendant running with a gun in his hand.

Later that night, M.H. gave a statement to the police. He told them about "that Nu Nu dude" and gave them a physical description. Subsequently, he was shown a photographic line-up containing six photographs. He was unable to positively identify

anyone from this line-up. He testified that he told the officers that he thought it was the person identified as number 3, but that he needed to see another picture. He explained that, in the first line-up, the hair of the person he thought was the Defendant was different. After viewing the first line-up, and being uncertain about the photographs, M. H. pulled up the Defendant's Facebook page and showed the Defendant's photograph to the officers, identifying him as Nu Nu.

The next day, officers showed him a second photographic line-up. This line-up contained the same Facebook photograph that M. H. had pulled up the day before. M. H. positively identified the Defendant in this second line-up on the basis of the photograph that he had provided.

Det. Elrod testified that he prepared the second line-up with the photograph of the Defendant that M. H. had pulled up previously.

The trial court issued a written order denying the Defendant's second motion to suppress his statement, ruling as follows:

> This Court . . . [must] determine . . . whether the Defendant was afforded reasonable time requirements pursuant to T[ennessee] C[ode] A[nnotated] [section] 37-1-115 and T[ennessee] C[ode] A[nnotated] [section] 37-1-114. In this case, the Defendant was brought to the station for questioning in connection with a homicide. The Defendant's mother was called and informed of the reason for the Defendant's questioning. The Defendant's mother gave permission for the sergeants to question her child. Sergeants called the mother a second time, after an hour and twenty-three minutes, because sergeants wanted her present for questioning. However, the Defendant's mother was not reached, and sergeants made the decision to begin questioning the Defendant. The Defendant was given water, Dr. Pepper, and potato chips. The Defendant was given a restroom break twice and was only held for a total of five hours.
>
> The Defendant was questioned by the sergeants because this was a homicide case. T[ennessee] C[ode] A[nnotated] [section] 37-1-114 is clear in allowing an exception in questioning for minors when there has been the death of a victim and the holding and/or questioning of a juvenile is based on probable cause. The sergeants, based on the statements given by the victim's brother, had probable cause to believe that the Defendant was one of the perpetrators of the shooting death of the victim. Thus, T[ennessee] C[ode] A[nnotated] [section] 37-1-114 is met and applies in this case.

Accordingly, this Court will not suppress Defendant's statements because this Court finds that the Defendant was not held for an unreasonable time after being arrested and was afforded appropriate procedural safeguards.

The trial court also issued a written order granting the Defendant's third motion to suppress, holding that "because the photograph used in [the second photographic line-up] was provided to the officers by M. H., the lineup was unduly and unnecessarily suggestive."

Following these motions, the Defendant was tried before a jury. During the trial, the following evidence was adduced.

Donnell Parker testified that the victim, Michael Hawkins, was his nephew. On the evening of October 9, 2018, Mr. Parker was home with his family. The victim was sitting on the porch. Mr. Parker heard gunshots and, when he looked outside, saw the victim laying on the porch and calling his name. Mr. Parker opened the door and asked for his handgun. He saw three men running and fired his gun multiple times. He tended to his nephew while someone called 911.

M. H. testified that the victim was his older brother. M. H. was fourteen at the time his brother was shot and killed. He had been sitting on the porch with his brother but went inside to get something to drink. He was inside when he heard gunshots and heard his brother scream. When he went outside, he saw three people running. Two of the men who were running had guns in their hands while the third had "put their gun up in his draws [sic] or something."

M. H. recognized one of the men carrying a gun in his hand. M. H. testified that he knew this man's face from seeing him in "different schools" in the neighborhood. He knew this man as Nu Nu "or something like that." He had also seen this man in a car as he drove by Mr. Parker's residence the day before the shooting. M. H. stated that he had been on the porch with some other people when a black Impala drove by and the man hung out the car window and asked, "where the opps at." He explained that "opps" meant "opposition." The car drove down the street, turned around, stopped in front of the residence, and the man said, "A bullet ain't got a name on it." The car then drove off. This encounter occurred the day before the victim was shot.

M. H. testified that he spoke with the police on the night his brother was shot. He described for them one of the men he had seen running away and explained that he knew this man as Nu Nu. M. H. identified the Defendant in court as Nu Nu.

- 7 -

Det. Elrod testified that, when he was assigned to the case, the Defendant had already been identified as a suspect. The day after the shooting, he took a written statement from the Defendant. The statement was admitted into evidence and contains an admission from the Defendant that he shot "one time" at the victim. The Defendant also stated that he did not want to be involved in the shooting but was pressured into participating by his friends. The Defendant explained that the shooting was in retaliation for the victim having shot at him the week before. The Defendant stated that the gun he fired at the victim was a Cobra .45 caliber handgun. Det. Elrod testified that, in spite of multiple searches, no guns used against the victim were recovered.

Dr. Marco Ross testified about the autopsy performed on the victim. He testified that the victim had suffered three gunshot wounds. Two of the wounds were grazes and were not fatal. The third gunshot wound went through the victim's torso and was fatal. The bullet exited the victim's body and was not recovered. The victim was 16 years old at the time of his death.

Quantessa Hutchinson, the Defendant's mother, was called by the defense. She testified that she spoke with an officer over the phone after the Defendant was taken into custody, but she denied telling them to "go ahead" without her. She testified that she told the police "not to question my son." She stated that, after she arrived at the police station after her college class was over, she was not able to see her son. She was told that he had "confessed or something like that."

There was no further proof at trial. After deliberating, the jury returned a verdict of the lesser included offense of second degree murder. The trial court subsequently sentenced the Defendant as a Range I standard offender to twenty years of incarceration.

## ANALYSIS

In his first issue, the Defendant contends that the trial court erred in refusing to grant his first motion to suppress on the basis that his statement was coerced and involuntary, as well as not knowing. The State disagrees.

When evaluating a trial court's ruling on a motion to suppress, this court may consider the proof presented at both the suppression hearing and at trial. State v. Williamson, 368 S.W.3d 468, 473 (Tenn. 2012) (citing State v. Henning, 975 S.W.2d 290, 297-99 (Tenn. 1998)). "A trial court's findings of fact in a suppression hearing will be upheld unless the evidence preponderates otherwise." State v. Williams, 185 S.W.3d 311, 314 (Tenn. 2006) (citing State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996)). The Tennessee Supreme Court explained this standard:

Questions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact. The party prevailing in the trial court is entitled to the strongest legitimate view of the evidence adduced at the suppression hearing as well as all reasonable and legitimate inferences that may be drawn from that evidence. So long as the greater weight of the evidence supports the trial court's findings, those findings shall be upheld.

Odom, 928 S.W.2d at 23. However, this court's review of a trial court's application of the law to the facts is de novo. State v. Day, 263 S.W.3d 891, 900 (Tenn. 2008) (citing Williams, 185 S.W.3d at 315; State v. Yeargan, 958 S.W.2d 626, 629 (Tenn. 1997)).

The Fifth Amendment to the United States Constitution, applicable to the states through the Fourteenth Amendment, states that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. Similarly, the Tennessee Constitution provides "that in all criminal prosecutions, the accused . . . shall not be compelled to give evidence against himself." Tenn. Const. art. I, § 9. Under the Fifth Amendment, a confession is involuntary when it is the result of coercive action on the part of the State. Colorado v. Connelly, 479 U.S. 157, 163-64 (1986).

Because "coerced confessions are inherently unreliable," only voluntary confessions are admissible. State v. Climer, 400 S.W.3d 537, 567 (Tenn. 2013). In order for a statement to be voluntary, it "'must not be extracted by any sort of threats or violence, nor obtained by any direct or implied promises, however slight, nor by the exertion of any improper influence.'" State v. Kelly, 603 S.W.2d 726, 727 (Tenn. 1980) (quoting Bram v. United States, 168 U.S. 532, 542-43 (1897)).

Whether a confession is involuntary is a question of fact. State v. Willis, 496 S.W.3d 653, 695 (Tenn. 2016) (citing State v. Sanders, 452 S.W.3d 300, 305 (Tenn. 2014)). The State has the burden of establishing the voluntariness of a confession by a preponderance of the evidence. Id. (citing Sanders, 452 S.W.3d at 305). "The test of voluntariness for confessions under article I, § 9 of the Tennessee Constitution is broader and more protective of individual rights than the test of voluntariness under the Fifth Amendment." State v. Smith, 933 S.W.2d 450, 455 (Tenn. 1996); accord State v. Freeland, 451 S.W.3d 791, 815 (Tenn. 2014).

"The due process voluntariness test is distinct from Miranda." State v. Davidson, 509 S.W.3d 156, 189 (Tenn. 2016) (citing Dickerson v. United States, 530 U.S. 428, 434-35 (2000); Mincey v. Arizona, 437 U.S. 385, 397-98 (1978)). "[T]he essential inquiry under the voluntariness test is whether a suspect's will was overborne so as to render the confession a product of coercion." Id. (citing Freeland, 451 S.W.3d at 815). The

voluntariness test requires this court to assess the psychological impact on the accused and to evaluate the legal significance of the accused's reaction.  Id. (citing Schneckloth v. Bustamonte, 412 U.S. 218, 226 (1973)).  When determining whether a confession was made voluntarily, this Court must examine the totality of the circumstances, including the "characteristics of the accused and the details of the interrogation."  Id. (citing Dickerson, 530 U.S. at 434).  These circumstances include:

> "[T]he age of the accused; his lack of education or his intelligence level; the extent of his previous experience with the police; the repeated and prolonged nature of the questioning; the length of the detention of the accused before he gave the statement in question; the lack of any advice to the accused of his constitutional rights; whether there was an unnecessary delay in bringing him before a magistrate before he gave the confession; whether the accused was injured[,] intoxicated[,] or drugged, or in ill health when he gave the statement; whether the accused was deprived of food, sleep[,] or medical attention; whether the accused was physically abused; and whether the suspect was threatened with abuse."

Climer, 400 S.W.3d at 568 (quoting State v. Huddleston, 924 S.W.2d 666, 671 (Tenn. 1996)).  These same factors apply to juvenile defendants.  See State v. McKinney, 669 S.W.3d 753, 771-72 (Tenn. 2023).

In this case, the record establishes that the Defendant was seventeen years old at the time of his interrogation, one month shy of his eighteenth birthday.  He had completed at least a portion of eleventh grade.  He had been arrested at least four previous times.  His questioning occurred from approximately 3:30 p.m. until approximately 6:00 p.m.  The Defendant had been in custody for approximately one and a half hours before his questioning began.  The Defendant was advised of his constitutional rights pursuant to the Miranda advice form, which he signed.  The record does not indicate at what point the Defendant was brought before a magistrate; however, "a delay of less than forty-eight hours is presumptively reasonable."  State v. Bishop, 431 S.W.3d 22, 42 (Tenn. 2014).  The Defendant was not injured, intoxicated, drugged, or in ill health when he gave his statement.  The Defendant was not deprived of food, sleep, or medical attention.  The Defendant was not physically abused.  The Defendant was not threatened with abuse.  These factors weigh in favor of the voluntariness of the Defendant's statement.

The Defendant contends in his brief that he was "misled, and manipulated into giving a statement to law enforcement."  He states that "law enforcement led [him] to believe that his Mother would not, and did not want to be present, in order to influence [him] to provide a statement."  He argues that, as a result of being told that his mother did not want to be present, his "consent to give a statement was not informed."

- 10 -

However, the Defendant cites us to no authority for the proposition that, by learning that his mother was not going to be present during his questioning, his will was necessarily overborne and his ensuing statement was involuntary. Nor does he explain how his mother's absence rendered uninformed his consent to be questioned. The Defendant did not testify at the suppression hearing, nor did he offer any other proof about his state of mind during his interactions with Det. Elrod and Sgt. Jensen. While the Defendant relies on State v. Callahan, 979 S.W.2d 581 (Tenn. 1998), that case concerns the related, but distinct, inquiry into the validity of his waiver of his rights after being advised of them pursuant to Miranda. The trial court in this case specifically found that the Defendant's Miranda waiver was valid and that, accordingly, the voluntariness of his statement was not dependent upon the presence of his mother. See State v. Gordon, 642 S.W.2d 742, 745 (Tenn. Crim. App. 1982) (citing Braziel v. State, 529 S.W.2d 501, 506 (Tenn. Crim. App. 1975)). The record supports the trial court's decision, and the Defendant is not entitled to relief on this issue.

The Defendant next contends that the trial court erred in denying his second motion to suppress his statement, arguing that his statement should have been suppressed "because it was made after an illegal detention." The Defendant bases this contention on the approximately five-hour period that passed between his being taken into custody and his transfer to a juvenile detention center.

Our juvenile justice statutes provide, in pertinent part, that "[a] child taken into custody shall not be detained . . . unless there is probable cause to believe that the child . . . [h]as committed the delinquent . . . act with which the child is charged." Tenn. Code Ann. § 37-1-114(a)(1) (2013). Additionally, "[a] person taking a child into custody shall within a reasonable time . . . deliver such child to a detention or shelter care facility . . . ." Tenn. Code Ann. § 37-1-115(a)(2) (2018). We agree with the trial court's analysis of this issue, to wit, that there was probable cause sufficient to detain the Defendant and that the period of the Defendant's detention was reasonable. See, e.g., Gordon, 642 S.W.2d at 744-45 (holding that, where the defendant was ten days shy of his eighteenth birthday, a six-hour detention was not unreasonable).

Moreover, as this Court has previously recognized,

Violations of Tennessee Code Annotated Sections 37-1-114 or 115 can result in the exclusion of an extra-judicial statement under section 37-1-127(c). However, the Tennessee Supreme Court has held that the protections afforded by section 37-1-127(c) are only applicable *in juvenile court*, and they have no bearing on the use of the statement at trial. State v. Lundy, 808 S.W.2d 444, 446 (Tenn. 1991) (citing Colyer v. State, 577 S.W.2d 460, 462

(Tenn. 1979) and State v. Turnmire, 762 S.W.2d 893, 896 (Tenn. Crim. App. 1988)); see also State v. Antonio M. Byrd, No. 02C01-9508-CR-00232, 1997 WL 1235, at *10 (Tenn. Crim. App. Jan. 2, 1997) ("A violation of Tenn. Code Ann. § 37-1-115 is not a basis for the exclusion of a statement.").

State v. Taylor, No. W2008-01863-CCA-R3-CD, 2010 WL 3307072, at *9 (Tenn. Crim. App. Aug. 23, 2010) (footnote omitted).

The Defendant is not entitled to relief on this basis.

Finally, the Defendant argues that, due to the unduly suggestive nature of the second photographic line-up, the trial court erred by allowing M. H. to make an in-court identification of the Defendant. However, this issue is waived because the Defendant did not raise this alleged trial error in his motion for new trial. As this Court has recognized, Tennessee Rule of Appellate Procedure 3(e) provides that "no issue presented for review shall be predicated upon error in the admission or exclusion of evidence . . . or other ground upon which a new trial is sought, unless the same was specifically stated in a motion for new trial; otherwise, such issues will be treated as waived." See, e.g., State v. Pompa, No. M2016-00193-CCA-R3-CD, 2017 WL 1014529, at *8 (Tenn. Crim. App. Mar. 15, 2017). Although it is within this Court's discretion to address waived errors under the plain error doctrine, see Tenn. R. App. P. 36(b), we decline to exercise such discretion in this case. The Defendant failed to request plain error review and failed to file a reply brief responding to the States's waiver argument. See State v. Thompson, No. W2022-01535-CCA-R3-CD, 2023 WL 4552193, at *5 (Tenn. Crim. App. July 14, 2023) ("Where a defendant fails to respond to a waiver argument, only particularly compelling or egregious circumstances could typically justify our *sua sponte* consideration of plain error relief.") (citing State v. Powell, No. W2011-02685-CCA-R3-CD, 2013 WL 12185202, at *8 (Tenn. Crim. App. Apr. 26, 2013)). Accordingly, we conclude that the Defendant has waived this issue and is not entitled to relief.

## CONCLUSION

The State points out in its brief that the amended judgment document entered in this matter on November 18, 2024, shows that the indicted offense was second degree murder. Because the indicted offense was first degree premeditated murder, we remand this matter for the entry of a corrected judgment. In all other respects, we affirm the trial court's judgment.

s/ **Camille R. McMullen**
CAMILLE R. MCMULLEN, JUDGE